## MORETRENCH CORPORATION v. FEDERAL TRADE COMMISSION.
### No. 2.

Circuit Court of Appeals, Second Circuit.
May 4, 1942.

Moretrench has an added valve set between the screen and the solid pipe so as to close during "jetting," and to prevent all "jetting" water from flowing up ("backwashing") into the draining space.

Samuel J. Reid, of New York City, and McCole & Reid, of New York City, for petitioner.

Cyrus B. Austin and W. T. Kelley, both of Washington, D. C., for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The Moretrench Corporation complains of an order of the Federal Trade Commission which found that certain statements occurring in its advertising were false, and which ordered it to "cease and desist" from repeating them in the future. The Commission now concedes that its original order should be modified, and the only question before us is whether as modified it finds support in the findings, and whether the evidence supports the findings. To an understanding of this question, some account of the Moretrench Corporation's business is necessary. It makes, sells and installs systems of pumps, piping and wellpoints which are used to drain wet places preparatory to building or engineering operations. The wellpoints about which this controversy turns are the means by which the water is sucked up which the piping discharges away from the locus in quo. The Moretrench wellpoint is a metal nozzle about three and a half feet long, made up of an inner solid pipe surrounded by seven longitudinal metal rods, which are enclosed by a copper screen of wide mesh and heavy wire. Outside of this screen is a screen of fine wire and small mesh, and outside of the fine screen is a third screen of the same size wire and mesh as the first. The fine screen is thus held between the two coarse screens; it is known as the "water-passing screen." In operation, the lower end of the wellpoint is sunk into the ground and the water is sucked through the three screens, whence it passes up between the metal rods outside the solid pipe, and is carried away through the piping. To sink the wellpoint into position, water is "jetted" through the hollow pipe, at the bottom of which is a rubber ball arranged as a valve to open when water is forced through it and to close when water is sucked into it. All wellpoints have such a valve but the

The Moretrench Corporation put out an advertising pamphlet in which it compared its system with that of its competitors, of which only two are in question here: the Complete and the Griffin. The pamphlet contained photographs of its screen and of a section of its wellpoint, together with photographs of the screen of other makers; also a photograph of five wellpoints side by side in elevation, including its own, the Complete and the Griffin. Below the last photograph was a table professing to give statistics as to the wellpoints shown, in the first line of which was the legend: "Unobstructed water-passing screen area in square inches." The Moretrench wellpoint was credited with 350 inches, the Complete with 40, and the Griffin with 85. The Commission has found that this statement was untrue and has directed its discontinuance. The second statement which it forbade was that the Complete and Griffin wellpoints "have only a limited use as jetting points, because they lack a valve to prevent back waste of the jetting water, and cannot wash the jetted hole out as thoroughly as it should be done to get the best service with the water pressure available." On another page of the Moretrench pamphlet appeared photographs of its wellpoint and another of the Complete, while both were "jetting"; below was the statement that the Complete wellpoint "backwasted nearly all of the jetting pressure." The third statement forbidden is that a Moretrench wellpoint was equal or superior to five of any other wellpoints; the fourth, that it never "clogs"; the fifth, that "contractors all over the world testify" that the cost of its operation is always fifty per cent lower than that of competitors'.

The Complete wellpoint is made of a hollow pipe like the Moretrench, but instead of being circular in section its outer surface is fluted. When the fine screen is wrapped outside the pipe, it necessarily touches it only at the outer turns of the flutings, leaving vertical grooves for draining the water between pipe and screen. Around the outside of the fine screen is wrapped a perforated casing against the inside of which the inner screen fits snugly when the wellpoint is delivered, but from which it backs away a little in use, except

where the casing holds it close to the outer turns of the flutings. The Griffin wellpoint has an inner pipe whose outer surface is circular in section like the Moretrench; and in order to make a draining space between it and the screen, a convoluted perforated sheet of metal is interposed between the two, which presents a surface to the fine screen like the flutings of the Complete wellpoint except for the perforations. Around this sheet the fine screen is wrapped, making vertical draining passages between the two; and also between the pipe and the inner side of sheet, for so much of the water as passes through the perforations. Around the fine screen is finally wrapped a perforated casing like that in the Complete. As in the case of the Complete wellpoint, the fine screen when delivered fits snugly against the inside of the casing, but in use it backs off a little except where it is held against a convolution of the inner sheet. Neither wellpoint has a second valve to stop the "backwash" during "jetting."

The first question is as to the meaning of the phrase: "Unobstructed water-passing screen area." The witnesses for the Moretrench Corporation understood this to mean the whole area of the fine screen so far as the inner and outer coarse screens did not block it off. They therefore subtracted from its gross area the aggregate area of the points at which the coarse screens touched it, and that of the solder spots by which the two edges of the outer coarse screen were held together. The Commission did not accept this definition; it thought it misleading to disregard the size of the mesh of the fine screen, since a screen can drain water only through its openings. However, it was content arguendo to accept the experts' definition, because it concluded that they did not apply it consistently to the Complete and Griffin wellpoints. They had computed the unobstructed area as though the fine screens remained in service snugly pressed against the inner surface of the casings as they were when delivered. This was a very natural mistake, and except for it the conclusion would have been right; perhaps the Moretrench Corporation did not know that the fine screen backed away; in any event there is no reason to suppose that the advertisement was not put forward in good faith.

■ However, as we have said, the fine screen does back away (this becomes ap-

parent upon an examination of the physical exhibits) and it is not disputed that—when dealing with such slowly moving water as passes through the screens when the pumps are sucking—the separation is enough to eliminate any blockage by the casings, except where the fine screen is held fast against the flutings or convolutions. If the "unobstructed water-passing screen areas" of either the Complete, or the Griffin, wellpoint be computed upon that basis, the advertisement allowed them much too little. It does not indeed appear how great that understatement was, and it would be difficult if not impossible to estimate it with accuracy, for the fine screen will not back away from the casing uniformly everywhere. Perhaps it was for this reason, that the Commission made no attempt to find what were the unblocked areas of the Complete and Griffin wellpoints, contenting itself with merely finding that the advertisement was misleading, as it unquestionably was, if it be read as referring to the wellpoints after they have been in service. It seems to us clear that it should be so read; buyers would obviously only care about the operation of the wellpoint, not about its condition upon delivery. We conclude therefore that the first part of the order was justified and it is affirmed pro tanto, as modified.

■ The second question is of the effect of not introducing a second valve to prevent "backwash." The second valve does do just that, and the Commission now concedes that the Moretrench Corporation should be allowed to proclaim the advantages of its own construction; for this reason its order only forbids "disparaging" the Complete or Griffin wellpoints because they do not prevent "backwash." Apparently the trade differs as to the value of this feature; particularly in the case of a pointed wellpoint, like the Complete and the Griffin; some people believe it to be an advantage to have some of the "jetting" water flow back into the draining space and out through holes in the side of the point. They think that it "lubricates" the surrounding soil and makes it easier to sink the wellpoint. Moreover, they believe that the "backwash" helps clear the screen as it sinks, and that it is otherwise likely to become clogged. There was testimony to that effect which the Commission might accept, as it did in preference to the contrary testimony of the Moretrench Corporation's experts. On the record we doubt

whether we should have concluded that the "disparaging" statements were misleading; but since our office ends as soon as we find substantial support for the finding, this part of the order must also be affirmed.

 The next statement challenged is that one Moretrench wellpoint is as good as any five others and never clogs. This was part of an insignificant advertisement which appeared over five years ago and had been discontinued before the complaint was filed. It was put in quotes and followed by the words: "say experienced contractors." It is not apparent how it is important now to forbid its repetition. Nevertheless, the Commission thought it otherwise, took evidence upon the issue, found that it was untrue—which literally it was—and now presses this part of the order. The only point which can be made against it is that it was put forward as an opinion of others, and not as emanating from the Moretrench Corporation itself. It is extremely hard to believe that any buyers of such machinery could be misled by anything which was patently no more than the exuberant enthusiasm of a satisfied customer, but in such matters we understand that we are to insist upon the most literal truthfulness. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141. Nor is it an excuse for a statement after it is known to be false, that it is put forward as a quotation. United States v. John J. Fulton Co., 9 Cir., 33 F.2d 506, 507.

The last of the misleading statements is that "contractors all over the world testify" that operating cost of the Moretrench system is fifty per cent lower than that of any other. This was part of the same obscure advertisement we have just mentioned, and of another, equally obscure, published thirteen months later. Literally speaking, it was of course untrue; contractors "all over the world" did not testify as they were quoted. As this was the only part found to have been false, it is again hard to imagine how anyone reading it could have understood it as more than puffing; yet for the reasons we have just given, if the Commission saw fit to take notice of it, we may not interfere.

 The final complaint is that the "proceeding" before the Commission does not "appear" to have been "to the interest of the public". § 45(b) of Title 15 U.S.C.A.

Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838, did indeed decide that the public interest in the controversy was a justiciable issue, and that it had no interest in the proceeding there at bar. The dispute concerned the use of a trade-mark which the respondent Klesner had adopted out of spite against its owner, Sammons; and the discussion left it not altogether clear why the public had no interest in its settlement. One might perhaps infer that if the only interest at stake is that customers shall get goods from the seller of whom they supposed they are buying, it is not enough, provided the quality is as good as what they think they are receiving; but it seems clear from what the court has said later that this is not so. Federal Trade Commission v. Royal Milling Co., 288 U.S. 212, 216, 217, 53 S.Ct. 335, 77 L.Ed. 706; Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 78, 54 S.Ct. 315, 320, 78 L.Ed. 655. In the last case Cardozo, J., went indeed so far as to say: "the public is entitled to get what it chooses, though the choice may be dictated by caprice or by fashion or perhaps by ignorance." It would seem, therefore, that Federal Trade Commission v. Klesner, supra, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838, is to be put down as deciding that the court may consider whether the controversy is not in general too trivial to justify the attention of the Commission. If so, it is doubtful whether today the same answer would be given; and even if it would, the result is the same in the case at bar for the interest here was not necessarily trivial. Certainly the Moretrench Corporation did not think it so, else it would not have gone to the trouble and expense which it did; nor did its competitors think so for it was they that stirred up the proceeding. True, one might suppose that the customers were of a kind not to be influenced by such advertising; but once more, the attitude of the manufacturers proves the opposite. If the controversy concerned only such statements as the third, fourth and fifth, it would indeed be hard to resist the argument that the whole affair was too tenuous for even that minimum which will justify the Commission's action. But for the reasons we have just given we cannot say that the public has no interest in the truth about those features of the wellpoints with which the

first and second statements were concerned. That interest was enough to support the proceeding.

Order affirmed, as modified by the Commission.