**EXPOSITION PRESS, INC. and Edward Uhlan, Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondents.**

**No. 17, Docket 26840.**

United States Court of Appeals
Second Circuit.

Argued Sept. 29, 1961.

Decided Nov. 6, 1961.

Philip Adler, New York City, for petitioners.

Charles C. Moore, Jr., Federal Trade Commission, Washington, D. C. (James McI. Henderson, Gen. Counsel, Alan B. Hobbes, Asst. Gen. Counsel, and Jno. W. Carter, Jr., Federal Trade Commission, Washington, D. C., on the brief), for respondents.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

LUMBARD, Chief Judge.

Exposition Press, Inc. and Edward Uhlan, its president, petition for review of an order directing them to cease and desist from certain deceptive advertising practices entered by the Federal Trade Commission pursuant to § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45.[1]

Petitioners attack the order on a number of grounds; that the complaint before the Federal Trade Commission did not state a cause of action, that the Commission's findings of deceptiveness are erroneous, that on principles of *res judicata* the Commission's proceedings were barred by an earlier consent order, and that in any event the Commission's order is too broad and should be modified. We find these contentions to be without merit.

Exposition Press, Inc. is a "subsidy" or "vanity" publisher. Its business differs

from that of most publishing houses in that normally most or all of the expense of publishing its books is paid in advance by their authors. Less than 10% of its authors recoup their investments and derive actual profit from their writing.[2]

The Commission's complaint attacked Exposition's use of the following advertisement, which was inserted in a variety of newspapers and magazines:

"Free to Writers

seeking a book publisher

Two fact-filled, illustrated brochures tell how to publish your book, get 40% royalties, national advertising, publicity and promotion. Free editorial appraisal. Write Dept. STM–3.

Exposition Press / 386 4th Ave., N. Y. 16"

The hearing examiner found that the application of the term "royalty" to any payments from sales receipts made to an author before his entire investment had been returned was deceptive *per se*.

The Commission vacated the examiner's findings and made more limited findings to the effect that the advertisement as worded tended to "mislead and deceive a substantial portion of the purchasing public with respect to the payment they will receive for the publication of their books. * * *" It entered an order that petitioners cease and desist from:

"Representing through the use of the term 'royalties' or in any other manner that they will make payments to an author based on sales of the author's book unless a disclosure is made in immediate conjunction therewith that such payments do not constitute a net return to the author but that the cost of printing, promoting, selling and distributing the book

1. "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are [hereby] declared unlawful." 66 Stat. 632 (1952), 15 U.S.C.A. § 45(a) (1).

2. Of the authors published by Exposition, Dr. Cleere, for example, advanced $2,-

100 for publication of his book "Hello, Hello, Hello Doc" and received back $242 in "royalties." Mrs. Royall, for her "Andrew Johnson, Presidential Scapegoat," paid Exposition $2,600 and got $239 back. Miss Claytor, for her "The God-Guided Life," paid $1,150 and got $53 back.

must be paid in whole or in substantial part by the author."

A subsequent motion to modify the order was denied.

■ 1. *Res Judicata*—We agree with the hearing examiner and the Commission that the consent order agreed to between Exposition and the Commission in November 1957 does not bar the present proceeding. Exposition argues that this earlier order, which dismissed "all other charges in the complaint," disposed of the question whether the mode of advertising now attacked was unfair. Its argument is not that the earlier complaint specifically alleged misuse of the term "royalty," but rather that because of a statement by Commission counsel at the earlier hearing that "respondents have dubbed it a royalty when it is only a percentage paid back" the question was put in issue, or in any event should have been.

■ The advertisement here in question was first used by Exposition only after the completion of the earlier proceeding. There is no indication that prior to the earlier proceeding similar representations had been made to the public at large that Exposition was a regular trade publisher which paid extraordinarily high compensation to its authors. In any event, new violations will support new proceedings dealing with different periods of time, at least where there is no indication of harassment by the Commission. See F.T.C. v. Raladam Co., 1942, 316 U.S. 149, 62 S.Ct. 966, 86 L.Ed. 1336; 2 Davis Administrative Law Treatise 570–71 (1958); cf. Grandview Dairy, Inc. v. Jones, 2 Cir., 157 F.2d 5, certiorari denied, 1946, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675. Incidental mention in the earlier hearing of misuse of the word "royalty" could not possibly have put in issue the questions raised by this advertisement.

■ 2. *Findings and Conclusion of the Commission*—Considering the record as a whole, see Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71

S.Ct. 456, 95 L.Ed. 456, we find substantial support for the Commission's finding that Exposition's advertisement had "the tendency and capacity to deceive a substantial portion of the purchasing public." Great weight must be given by us to the Commission's factual inferences. Corn Products Ref. Co. v. F.T.C., 1945, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320. Although only one of the author-witnesses testified to having been actually deceived by the advertisement in question, a majority of the Exposition clients who testified said that, although they had begun their dealings with Exposition prior to the use of this advertisement, it would have deceived them but for their present sophistication. Considering this testimony, the dictionary definition of "royalty" as "a duty or compensation paid to the owner of a * * * copyright for the use of it * * *,"[3] and the somewhat ambivalent testimony of publishers as to the technical usage of the word, we find ample reason to believe that the ordinary reader of the advertisement would be misled as to Exposition's terms of publication. Actual consumer testimony is in fact not needed to support an inference of deceptiveness by the Commission. Charles of the Ritz Distributors Corp. v. F. T. C., 2 Cir., 1944, 143 F.2d 676, 680; cf. E. F. Drew & Co. v. F. T. C., 2 Cir., 1956, 235 F.2d 735, certiorari denied, 1957, 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed. 323. In evaluating the tendency of language to deceive, the Commission should look not to the most sophisticated readers but rather to the least. F. T. C. v. Standard Educ. Soc'y, 1937, 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141; Book-of-the-Month Club, Inc. v. F. T. C., 2 Cir., 202 F.2d 486, certiorari dismissed, 1953, 346 U.S. 883, 74 S.Ct. 144, 98 L.Ed. 388. For this reason we must reject the argument that any reasonable author should have known enough not to expect a free-and-clear 40% royalty; the fact that a person has produced a manuscript does not necessarily mean that he has any knowledge of publishers' prevailing rates.

3. Webster's New International Dictionary, 2 Ed. Unabridged (1960). See Charles of the Ritz Distributing Corp. v. F. T. C., 2 Cir., 1944, 143 F.2d 676, 679.

A more serious problem is raised by the argument that, even granting the deceptiveness of the initial advertisement, no cause of action under Section 5 was made out since any prospective customer answering the advertisement was immediately sent literature which made it clear, before any contract was made, that the author was required to subsidize the expenses of publication. Since the Commission's findings was only that the advertisement was deceptive, we must accept this contention that the initial misconception was soon clarified.

Nontheless, we hold that it was within the Commission's power to prohibit the initial deception. "The law is violated if the first contact * * * is secured by deception * * *, even though the true facts are made known to the buyer before he enters into the contract of purchase." Carter Prods., Inc. v. F.T.C., 7 Cir., 1951, 186 F.2d 821, 824; see Book-of-the-Month Club, Inc. v. F.T.C., supra; Progress Tailoring Co. v. F. T. C., 7 Cir., 1946, 153 F.2d 103.

In any event, the Commission found that Exposition's competitors were injured by the tendency of the deception to "induce [authors] * * * to enter into correspondence with respondents, leading in many instances to the acceptance of a contract for respondent's services." It was a permissible inference that Exposition by its misleading initial approach attracted business which it would not otherwise have obtained. In such a situation testimony of actual injury to specific competitors is not required. F. T. C. v. Raladam Co., 1942, 316 U. S. 149, 152, 62 S.Ct. 966, 86 L.Ed. 1336. Although the Commission did not explicitly marshal evidence of the existence of other subsidy publishers competing with Exposition, the fact that there are such publishers emerges amply from a reading of the record as a whole. Even if these competing publishers did use various unfair methods of their own for attracting business (which the record in this case does not show), this would not excuse Exposition's unfair deception. Cf. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219.

Although the Federal Trade Commission can act against a deceptive advertiser only if it finds such action to be "to the interest of the public," Federal Trade Commission Act § 5(b), 15 U.S.C.A. § 45(b), and although its finding of public interest is subject to our review, F. T. C. v. Klesner, 1929, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, we think there is sufficient public interest in preventing Exposition's deceptive advertising to justify our enforcement of the Commission's order. This is not, like the Klesner case, an instance of Federal Trade Commission intervention in a private dispute. Nor was the deception only as to trivial matters, see Moretrench Corp. v. F. T. C., 2 Cir., 1942, 127 F.2d 792, 795 (dictum). That the deception may be remedied before the customer has suffered any more pecuniary loss than the price of a postage stamp does not foreclose the Commission from acting to proscribe it in the first instance.

Judge Friendly argues with great force that this violation was trivial and that it is not in the public interest to kill this gnat with Commission dynamite. But it seems to us that once we say that the courts should exercise their judgment as to whether an alleged deception is of sufficient importance to warrant Commission action, we get into matters which are not entrusted to us and as to which we have little qualification and even less necessary information. For example, we cannot know but what a proceeding such as this might be the means whereby in the long run the Commission may use its influence to prevent continuance of many similar deceptions. It is by such means that laws are enforced and the government is able to bring about a better moral climate in the field of advertising. From the many hundreds of complaints it has before it, surely the Commission is better able to judge whether this proceeding is a step forward in the attainment of a higher morality in the great mass of in-

formation and propaganda designed to influence the public.

**3.** *The Wording of the Cease-and-Desist Order*—Considering the violation, the wording of the Commission's order is unexceptionable. The Commission has wide discretion in framing its order, and "the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." Jacob Siegel Co. v. F. T. C., 1946, 327 U.S. 608, 66 S.Ct. 758, 760, 90 L.Ed. 888. The violation consisted in representing that the author's share of sales receipts is income to him, free and clear, and no alternative formula has been suggested which would remedy the likelihood of such misrepresentation. To permit the advertisement to state, as Exposition proposes, that authors "get 40% of retail price" would perpetuate the same deception.

The petition to review and set aside the Commission's order is denied. The order will be enforced pursuant to Federal Trade Commission Act § 5(c), 15 U.S. C.A. § 45(c).

FRIENDLY, Circuit Judge (dissenting).

Some people think they have written books for which the world is waiting. Publishers who must back judgment with investment take a less sanguine view. Rejection slips accumulate, and frustration mounts. Petitioners are in the business of relieving it.

In September, 1956, the F. T. C. issued a complaint, Docket 6638, CCH Trade Regulation Reporter, 1956–1957, ¶ 26,220, challenging a number of petitioners' then trade practices, many of them apparently subject to fairly serious criticism. A hearing followed, in which 1000 pages of testimony were taken and more than 200 exhibits filed. Ultimately, the Commission entered a consent order directing petitioners to cease and desist from 25 specified practices and dismissing all other charges in regard to unfair methods of competition and unfair deceptive acts and practices, 54 F.T.C. 908 (1958). Ad-

vertising similar to the ad, first published in November, 1957, which is the subject of the order here under review, was not among the acts or practices so prohibited —although three of the authors called by the Commission to support the instant complaint testified they had begun to deal with Exposition Press as a result of similar advertisements published in 1955 or early 1956.

The F. T. C. makes no claim that petitioners have failed meticulously to observe the comprehensive cease and desist order entered as a result of the previous proceeding. Instead, in May, 1959, only fifteen months later, the Commission issued a new complaint. This charged that respondents (now petitioners) "have made many statements and representations, directly or indirectly, concerning the nature and operation of their said business, the sales and payments made therefor to author customers. Among said statements set out in a variety of ways is that respondents pay their authors a 40% royalty on books published and sold by them," whereas "In truth and in fact, respondents do not pay their authors a 40% royalty or any kind of royalty."

As Chief Judge Lumbard's opinion reveals, these broad charges ultimately simmered down to a single narrow one. Not only the head and front but the whole of petitioners' offending is an advertisement, an inch and a quarter long and two inches and a quarter wide. The brochures there offered as "free" were, in fact, free—the case thus bears no resemblance to F. T. C. v. Standard Education Society, 1937, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141, or to Book-of-the-Month Club, Inc. v. F. T. C., 2 Cir., 202 F.2d 486, certiorari dismissed, 1953, 346 U.S. 883, 74 S.Ct. 144, 98 L.Ed. 388. The brochures did tell "how to publish your book, get 40% royalties" etc. Moreover, and this is the essential, they told it in a way that left no slightest doubt that the author must pay Exposition "a subsidy in three installments for the publication of the first edition of his book." Beyond that, Exposition advised him "to seek publication

on a non-subsidized basis, if possible," and to turn to Exposition only if that endeavor failed. If Exposition then found the manuscript acceptable, "we will submit our terms for your careful consideration." While the hope of financial success was not snuffed out, the brochures recognized "The uppermost question in the mind of an author considering a subsidized publication venture is: 'What will it cost to publish my book?'" Specimen figures showed to anyone endowed with even an elementary knowledge of arithmetic, that, for example, the "subsidy" required to publish an edition of 2500 copies of a 176 page book would exceed the 40% royalties unless some 1800 copies were sold. If the author ever arrived at a contract with Exposition, the "subsidy" he was required to pay was plainly set out immediately under a paragraph entitled "No Sales Guarantee," reciting "that neither party estimates or guarantees the number of copies of this work which shall be sold, it being recognized that it is impossible to predict such sales."

Although there was no dispute as to any of this, the Commission proceeded to amass a record formidable in size, if not in content. Hearings were held on nine separate days, some in New York City and others in Richmond, Va., where Exposition was not represented by counsel,[1] and accumulated a transcript of 1100 pages and numerous exhibits. The Commission called ten authors who had dealt with Exposition. Six of these had begun their dealings before the advertisement now banned was published; hence their testimony, taken most favorably to the Commission, is not that they were misled by the challenged advertisement but that they thought they would have been if they had seen that and nothing more. Of the four who had answered the ad, only one would have interpreted it as not calling for any payment by him, and none were dissatisfied. The slender evidence supplied by these ten authors was sought to

be eked out by the testimony of five "professional publishers" and three professional authors. The role of these eight witnesses is somewhat puzzling; apparently they were giving testimony, as experts, how they would have understood the ad if they had not been.

With the best-known writers receiving royalties of 15% to 20%, an author yet unknown to fame must possess altogether inordinate naïveté to suppose that anyone would pay all the costs of publishing his brainchild and a 40% royalty to boot. Thus I am by no means sure the Commission's basic finding that the ad conveyed a misleading impression of what the free brochures would convey is sustainable, even taking into account Judge Augustus Hand's statement that the Commission may insist "upon a form of advertising clear enough so that, in the words of the prophet Isaiah, 'wayfaring men, though fools, shall not err therein,'" General Motors Corp. v. F. T. C., 2 Cir., 1940, 114 F.2d 33, 36, and the Commission's admittedly broad power to draw inferences. However, there is no occasion to debate this, for the evidence makes it plain beyond peradventure, and the absence of any contrary findings confirms, that any remote tendency of the ad to mislead was ended when the brochures arrived. Hence the only prejudice possibly suffered even by the most wayfaring and foolish authors would be a 4¢ stamp, the depression when the brochures dissipated the temporary euphoria of thinking their books would be published without cost, and perhaps an occasional decision, taken with all the facts fully disclosed, to move into a flame of publication that otherwise would have stayed unseen.

I cannot believe this came within the area with which Congress was concerned when it created the Federal Trade Commission and empowered it to prevent "unfair methods of competition in commerce" in 1914, 38 Stat. 717, 719, § 5, or even when Congress added "unfair or deceptive acts or practices in commerce" in

---

1. I gather that, due to the financial burden of FTC proceedings, this is not an uncommon development. See, e. g., Brief for petitioner in Ward Laboratories, Inc. v. F.T.C., 2 Cir., 1960, 276 F.2d 952, p. 4.

1938, 52 Stat. 111, 112. Whether a particular activity offends § 5 remains a question for the courts to decide, F. T. C. v. Gratz, 1920, 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993. Although the 1914 debates reveal "no clear agreement" on the meaning of § 5, all the speakers were a long way from anything with so ephemeral an effect as what was proven here,[2] and the 1938 amendment, designed to eliminate the need of proving a potential adverse effect on competition, did not eliminate the need of establishing the potentiality of the kind of adverse effect of which the law customarily takes note. Although the Commission is not limited to common law concepts, F. T. C. v. R. F. Keppel & Bro. Inc., 1934, 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814, that decision itself indicates the type of showing needed to support a departure from them.

Neither the language nor the history of the statute reveals a purpose to bring the vast power of the Federal Government into play simply to prevent what at most is a slight excess in a blurb, completely rectified before it can have any adverse economic effect on any reader. The General Motors case, supra, is not a parallel. It dealt with nationwide advertising involving a mathematical concept which, though simple to the initiate, may well have lain beyond the ken of the multitude who were committing their funds, even when it was explained in greater detail, as it not always was. So too, Carter Products, Inc. v. F. T. C., 7 Cir., 1951, 186 F.2d 821, is altogether different, since there the disclosure on the package did not come to the purchaser's attention until he had spent his money. The broad statement in that opinion quoted by my brothers is a dictum going far beyond F. T. C. v. Standard Education Society, supra, which was cited to support it; in Standard Education, the false statement was repeated in the purchase contract and the defense that was overruled was simply that no one in his senses could

really have believed it. Progress Tailoring Co. v. F. T. C., 7 Cir., 1946, 153 F.2d 103, merely applied the principle, of Standard Education, that a seller may not advertise as free what is not in fact free. The injury to Exposition's competitors on which my brothers rely, although "found," was not proved; and at the argument before us counsel for the Commission properly disclaimed any reliance on it. The appendices to the briefs contain almost nothing to show the existence of other "subsidy" publishers and surely nothing to indicate that petitioners' present methods, more ethical than theirs so far as the appendices show, were likely to cause any diversion from them. In contrast, in the second Raladam case, 1942, 316 U.S. 149, 62 S.Ct. 966, 86 L.Ed. 1336, cited by the majority, there was evidence permitting the Commission to "conclude that numerous antifat remedies were offered for sale in the same market as Marmola" and that unless the misleading representations were stopped, "trade will be diverted from [other] competitors who do not engage in such 'unfair methods,' " 316 U.S. at page 152, 62 S.Ct. at page 968. I realize that, under the Wheeler-Lea amendment of 1938, it is enough for the Commission to prove an injury to consumers even though there be none to competitors, the first Raladam case, 1931, 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, being thereby overruled to that extent;[3] but if injury to competitors is relied on to bring an order within § 5, there being none to consumers, both Raladam decisions demand that such injury be established.

Moreover, the Wheeler-Lea amendment left unimpaired the provision in § 5(b), 15 U.S.C.A. § 45(b), limiting the Commission's jurisdiction to cases where "it [shall appear] to the Commission that a proceeding * * * would be to the interest of the public." In F. T. C. v. Klesner, 1929, 280 U.S. 19, 30, 50 S.Ct. 1, 4, 74 L.Ed. 138, the Supreme Court held

---

2. See Henderson, The Federal Trade Commission (1927), 33–36; Cushman, The Independent Regulatory Commissions (1941), 205–213.

3. Koch v. F. T. C., 6 Cir., 1953, 206 F.2d 311, 319. See Handler, The Control of

False Advertising Under the Wheeler-Lea Act, 6 Law and Contemporary Problems 91, 96 (1939); Note, The Consumer and Federal Regulation of Advertising, 53 Harv.L.Rev. 828, 834–837 (1940).

that although the Commission's preliminary determination that institution of a proceeding is in the public interest "will ordinarily be accepted by the courts," such action "is subject to judicial review"; that if it appears at any time that the proceeding is not in the public interest, the Commission ought dismiss the complaint; and that if the Commission nevertheless enters an order, "the court should, without enquiry into the merits, dismiss the suit." [4]

It is deeply significant that the Klesner opinion was written by Mr. Justice Brandeis. For "he, more than any other man, was the begetter" of the Federal Trade Commission.[5] Two years before that opinion, Henderson had published his critical study of the Commission, suggesting, among other things, that "it should exercise a greater discretion in selecting those cases which involve questions of public importance" and querying, as to the Klesner proceeding, 5 F.T.C. 24 (1922), "what there was in the case to call for the intervention of a federal administrative tribunal." [6] It is hardly accidental that Mr. Justice Brandeis placed the Supreme Court's decision in Klesner on the ground that he did, rather than simply affirming the Court of Appeals, 1928, 25 F.2d 524, 58 App.D.C. 100, on the merits. His opinion was a summons to the Commission to do what it had been created to do, to get on with "the great purpose of the act," as Mr. Justice Sutherland, also not without direct knowledge of the Act's origins, was later to say in an opinion in which Brandeis joined, F. T. C. v. Raladam Co., 283 U.S. at page 650, 51 S.Ct. at page 591, 75 L.Ed. 1324. True, as my brothers point out, Klesner involved a private controversy as the instant case does not; but the basis of the Klesner decision was not the presence of a private interest but the absence of a public one. In Moretrench Corporation

v. F. T. C., 2 Cir., 1942, 127 F.2d 792, 795, Judge Learned Hand, reviewing Klesner in the light of subsequent decisions, said that it "is to be put down as deciding that the court may consider whether the controversy is not in general too trivial to justify the attention of the Commission." See also S. Buchsbaum & Co. v. F. T. C., 7 Cir., 1947, 160 F.2d 121, 123. To me this second round against petitioners, brought to correct what at worst is a trifling lack of candor, passed over in the first one, and having a merely temporary and non-pecuniary effect on a handful of people presumably of some sophistication, precisely fits Judge Hand's test; the government funds that have been spent on this proceeding, not to speak of the diversion of energies from more worth-while tasks, outrun any possible public benefit by a tremendous margin.

I would grant the petition to review and annul the order.

---

4. The Klesner decision has been cited with approval as recently as American Airlines, Inc. v. North American Airlines, Inc., 1956, 351 U.S. 79, 83, 76 S.Ct. 600, 100 L.Ed. 953, and Klor's v. Broadway-Hales Stores, Inc., 1959, 359 U.S. 207, 211–212, fn. 4, 79 S.Ct. 705, 3 L.Ed.2d

741, the latter distinguishing the contrasting rule under § 1 of the Sherman Act, 15 U.S.C.A. § 1.

5. See Mason, Brandeis: A Free Man's Life (1946), p. 402.

6. Henderson, op. cit. supra note 2, pp. 337, 171.