694 P.2d 1228

**Walter C. MADSEN, Superintendent of Banks, and State of Arizona, ex rel. Robert K. Corbin, Attorney General, Plaintiffs-Appellants,**

**v.**

**WESTERN AMERICAN MORTGAGE COMPANY, an Arizona corporation; John Does 1–10 and Jane Does 1–10, husbands and wives; ABC Corporations; and XYZ Partnerships, Defendants-Appellees.**

No. 1 CA–CIV 6305.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 15, 1985.

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Chief Counsel, Financial Fraud Division, Stephen A. Avilla, John C. Dutton, Jr., and Karen A. Mullins, Asst. Attys. Gen., Phoenix, for plaintiffs-appellants.

Cook & Newman, Ltd. by Donald J. Newman, Phoenix, for defendants-appellees.

## OPINION

CONTRERAS, Judge.

The state appeals from summary judgment that was granted to Western American Mortgage Company (Western American). The trial court held, as a matter of law, that Western American's conduct, including the use of a "conditional" loan commitment letter in mortgage loan transactions, did not amount to a deceptive or misleading act or practice, or fraud, false pretense, false promise or misrepresentation under either the Arizona Consumer Fraud Act, A.R.S. § 44-1522(A), or the Arizona Mortgage Brokers Act, A.R.S. §§ 6-906(A) or 6-906(D). We reverse.

Western American is a state-licensed mortgage broker that offers individual home buyers loans insured by the Federal Housing Authority (FHA) or guaranteed by the Veterans Administration (VA). In the normal course of its business, Western American sells these loans to institutional investors in what is termed the secondary market. At times, the sale of these loans can become difficult because both the FHA and VA set maximum loan interest rates that are lower than the rates on conventional loans. To ensure the availability of FHA and VA loans, lenders have developed a "discount point" system [1] whereby cash

---

1. A discount point is equal to one percent of the principal loan amount.

payments are required as a condition of making the loans. These payments, normally made by the sellers, reduce the disbursements the lenders make at closing. The balance owed by the borrower, however, remains unchanged. The resultant effect is that lenders receive a higher effective yield than the stated interest rate. *See generally* G. Osborne, G. Nelson & D. Whitman, *Real Estate Finance Law* 651 (1979).[2]

The loans that give rise to the present action were negotiated in 1979 when interest rates were rising at an unprecedented rate. Although the FHA and VA raised their interest ceilings several times, their maximum rates lagged far behind the market rates for conventional loans. The discount points were increasing, contrary to historical precedent, at the same time the interest rates were adjusted upward. Between September 27, 1979, and October 24, 1979, the discount went from 4.75 percent to 11.5 percent. From January 1, 1979, until November 27, 1979, Western American used a written discount point commitment form in its FHA and VA loan transactions whereby it agreed to close, for a set number of days, an FHA-insured or VA-guaranteed mortgage loan at interest and discount rates specified in the agreement. The commitment form provided as follows:

DATE:                           RE: BUYER_____

TO:                              PROPERTY_____

WESTERN AMERICAN MORTGAGE COMPANY hereby agrees to close an FHA or VA mortgage loan on the subject property at an interest rate of ___% subject to a discount of ___ points based on the final approved mortgage amount. This quotation is conditioned upon the mortgagor meeting all credit requirements and the inspection and approval of the property.

This commitment is valid for a period of ___ days from the date of this letter and the loan must close at the title company on or before _____.

In the event of an interest rate change the above to be renegotiated.

WESTERN AMERICAN MORTGAGE COMPANY          AGREED AND ACCEPTED:

BY:_____

                                          Seller

                                          Seller

Please return one executed copy to Western American Mortgage Company.

---

The state filed a civil action on May 12, 1981, under the Arizona Consumer Fraud Act and under the Arizona Mortgage Brokers Act, alleging that during the period in question, Western American processed a substantial number of loans wherein the sellers were charged points higher than those that were expressly set forth in the

---

**2.** Western American's brief sets forth the following example from G. Osborne, G. Nelson & D. Whitman, *Real Estate Finance Law* 652 (1979): If the current conventional interest rate is 10% and the FHA–VA interest rate is 9.5%, a seller would be asked to pay a discount of four points, or $2,000, on a $50,000 loan. At closing, the lender would give the borrower $50,000, but would incur a net outlay of only $48,000. The borrower's monthly payments would be based on the $50,000 loan at 9.5% interest. The effect of the discount rate on the effective yield will depend on when the loan is repaid. Assuming an average 12-year life of the mortgage loan, a simple rule is used whereby one discount point is equated with an increase in yield of one-eighth of one percent. In our example, four discount points would increase the effective yield of the loan by about one-half of one percent, from 9.5% to 10%.

written commitment forms. It was further alleged that Western American had deceived and misled sellers of residential properties by issuing loan discount commitments it did not intend to honor. The state alleged that Western American violated the acts when it:

1. repeatedly refused to honor the commitment agreements, increasing the discount rate paid by the sellers without their knowledge or consent;

2. made loan commitment agreements that were misleading and deceptive representations of the points the sellers actually would be charged; and

3. concealed, suppressed or omitted material facts regarding the discount rates with the intent that this concealment, suppression or omission would be relied upon.

The state sought injunctive relief, civil penalties and restitution to the sellers who had experienced losses as a result of the alleged violations of the acts.

Western American moved for dismissal, contending that it was entitled to judgment as a matter of law because no issues of material fact existed.[3] It also contended that the attorney general lacked standing to sue under the Consumer Fraud Act since such actions are preempted under *People ex rel. Babbitt v. Green Acres Trust,* 127 Ariz. 160, 618 P.2d 1086 (App.1980), because of the comprehensive consumer protection provided by the Mortgage Brokers Act.[4] Additionally, Western American claimed the statute of limitations had run on the state's claims for restitution for individuals affected by Western American's conduct. Finally, Western American contended that the complaint should be dismissed because the attorney general had engaged in unethical and illegal conduct by publicizing the filing of this action. The state responded to Western American's motion and moved for partial summary judgment.

The trial court denied the state's motion for partial summary judgment and granted summary judgment for Western American, stating that as a matter of law, Western American's conduct, including its utilization of the so-called conditional commitment letter, did not constitute "... a deceptive or misleading act or practice, or fraud, false pretense, false promise or misrepresentation under either A.R.S. § 44–1522(A) or A.R.S. § 6–906(A) or 6–906(D)." The court stated that absent any evidence or inference of fraud, any management of a mortgage broker's attempt to cope with the vagaries of the mortgage money market should come from legislation or regulation.

The trial court did not reach the issue of whether maintenance of such action under the Consumer Fraud Act was preempted under *Green Acres Trust* because of the potential for action under the Mortgage Brokers Act. It also did not reach Western American's contentions that the statute of limitations had run or that the attorney general had acted improperly.

The first issue on appeal is whether the trial court was correct in ruling, as a matter of law, that Western American's conduct did not constitute fraud or misrepresentation under the Consumer Fraud Act or the Mortgage Brokers Act. The state argues that the court erred because Western American's practice of using the loan commitment agreements in question violated the Consumer Fraud and Mortgage Brokers acts by deceiving or misleading sellers into believing they were protected for a designated period of time from fluctuations

---

**3.** Appellee's "Motion to Dismiss" was supported by legal memoranda, exhibits, and affidavits. Although designated as a "Motion to Dismiss," in substance it was a motion for summary judgment and was treated as such by the trial court in accordance with Rules 12(b) and 56, Arizona Rules of Civil Procedure.

**4.** The Consumer Fraud Act was amended shortly after the *Green Acres Trust* decision to provide that remedies under the act would be in addition to all other causes of action, remedies and penalties. The amendment became effective on July 25, 1981, more than two months after the state filed this action. In *State ex rel. Corbin v. Pickrell,* 136 Ariz. 589, 667 P.2d 1304 (1983), the Arizona Supreme Court held that the amendment could be given only prospective application.

in interest rates. Furthermore, it is argued that Western American's use of the term "renegotiation" in the loan commitment was misleading and deceptive since Western American by its "take-it-or-leave-it" approach unilaterally changed the loan discount rate with no input from the consumer. Additionally, it is argued that Western American concealed material information by failing to inform sellers that discount rates frequently were subject to change. Finally, the state argues that questions of fact existed because the state by way of affidavits disputed Western American's claims that all sellers were notified in advance of changes in the discount rate. We start first with a consideration of our Consumer Fraud Act and our Mortgage Brokers Act.

■■■ The Consumer Fraud Act is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions. *Green Acres Trust*, 127 Ariz. at 164, 618 P.2d at 1090. An unlawful practice is defined as follows:

> The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby...

A.R.S. § 44–1522(A). The meaning of this definition becomes clearer when interpretations of 15 U.S.C.A. §§ 44, 52 and 55(a)(1), the Federal Trade Commission Act, are used as a guide, as A.R.S. § 44–1522(B) permits. The term "deceptive" has been interpreted to include representations that have a "tendency and capacity" to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C.Cir. 1977); *Goodman v. FTC*, 244 F.2d 584 (9th

Cir.1957), *reaffirmed in Simeon Management Corp. v. FTC*, 579 F.2d 1137 (9th Cir.1978). The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, *Spiegel, Inc. v. FTC*, 411 F.2d 481 (7th Cir.1969), and in evaluating the representations, the test is whether the least sophisticated reader would be misled. *Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir.1961), *cert. denied* 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962). Technical correctness of the representations is irrelevant if the capacity to mislead is found. *See Chrysler Corp. v. FTC, supra.* Additionally, a deceptive representation or practice may be found where earlier misrepresentations are corrected before the consumer agrees to a contract. *Exposition Press, supra.*

The Mortgage Brokers Act provides sanctions for those engaged in the mortgage broker business who commit any of the following:

> 1. Making any false promise likely to influence, persuade, or induce, or pursuing a course of misrepresentation or false promises through agents, employees, advertising or otherwise.
>
> 2. Substantial misrepresentation, circumvention, or concealment of any of the material particulars or the nature thereof, regarding a mortgage transaction to which he is a party...

A.R.S. § 6–906(A).

If Western American's loan commitment letter or practices had the capacity to mislead an ordinary person, then the trial court erred in ruling that, as a matter of law, Western American's use of a conditional commitment letter did not constitute actionable conduct under A.R.S. §§ 44–1522(A), 6–906(A) or 6–906(D).

■ Before reviewing the record, however, this court must address Western American's argument that the state failed to show the existence of material questions of fact because it failed to attach to its pleadings affidavits in the form required by Rule 56(e) of the Arizona Rules of Civil Procedure. The rule states that all affidavits must be made on personal knowledge,

set forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. The affidavits offered by the state meet these requirements. Western American contends that the state's affidavits do not show that they were properly taken before an officer with authority to administer an oath. As the state correctly argues, however, the state banking examiner and hearing officers have the statutory authority to administer oaths and take statements under A.R.S. § 6–124(B) (Supp.1974–1984). Additionally, the affidavits state that they are duly sworn, and they are signed and witnessed by the hearing officer. Furthermore, despite Western American's protestations about the form of the state's affidavits, it used two of them to buttress arguments in its combined response and reply memoranda. Consideration by the trial court and this court of the affidavits is proper.

■ In reviewing these affidavits, it becomes clear that questions of fact exist as to whether Western American raised the discount rate it charged without contacting the sellers or their agents. We cite to and discuss two specific instances. The affidavits the state presented include one by Ray Fix, a real estate agent who stated that although he represented Mr. and Mrs. Rick D. Moody, sellers in a transaction financed by Western American, he was not notified of an increase in points. In fact, according to his affidavit, Mr. Fix did not learn of the change until he reviewed the disbursement letter after the close of escrow. He further stated that he immediately contacted Mike Vance, a Western American escrow officer, and was told that Western American did not have to contact anyone because the commitment letter gave Western American authority to raise points automatically. Mr. Fix stated that Mr. Vance later told him that nothing could be done about the extra $700 the Moodys were charged. Virginia Reichard, who operated the firm where Mr. Fix worked, stated in her affidavit that Mr. Fix had no notice of any point change in the Moody transaction. She, too, contacted Western American to protest and states that she was told Western American had the right to raise the points. She further stated that no renegotiation took place. In an affidavit presented by Western American, Mr. Vance states that he notified the agent for the buyers of the Moodys' home, who also worked for Reichard's firm, and asked her to notify the sellers. Mr. Vance did not learn until after the close of escrow that Mr. Fix and Mr. Moody had not been notified.

In another set of affidavits offered by the state, real estate agent Jerry Kruetter and his client, Michael Morgan, state that they never received notice that the discount points would double on the sale of the Morgan home. Both Mr. Kruetter and Mr. Morgan state that they learned of the increase after escrow closed. Western American presented an affidavit of Suzanne Saunders, one of its loan processors, who states that she contacted Mr. Kruetter on October 26, 1979, to tell him Western American would be charging eight points on the Morgan transaction. Ms. Saunders states that Mr. Kruetter became verbally abusive and hung up after she told him eight points was the best Western American could do. In his affidavit, Mr. Kruetter specifically denies that he was contacted by "Suzi" or anyone else about this point change. Additionally, he and Mr. Morgan state that Western American did not attempt to negotiate the change.

■ As our review of the affidavits shows, it clearly appears that the state demonstrated that factual disputes existed as to whether Western American actually notified sellers or their agents about changes in discount rates. Under Arizona law, litigants are entitled to a trial where there is the slightest doubt as to the facts. *Mid-Century Insurance Co. v. Duzykowski,* 131 Ariz. 428, 641 P.2d 1272 (1982); *Peterson v. Valley National Bank of Phoenix,* 90 Ariz. 361, 368 P.2d 317 (1962). Furthermore, affidavits of the sellers and their agents in the Moody and Morgan transactions indicate the parties were surprised by the discount increases. Viewing

this evidence in the light most favorable to the losing party, *see e.g. Livingston v. Citizen's Utility Co.*, 107 Ariz. 62, 481 P.2d 855 (1971), it is reasonable to infer from this surprise that they, along with other sellers, may have been misled by the issuance or wording of Western American's loan commitment letter. As discussed earlier, representations may be actionable as deceptive when they have merely a "tendency and capacity" to mislead an ordinary purchaser. *Chrysler Corp. v. FTC, supra; Exposition Press, Inc. v. FTC, supra.* Allegations that Western American refused to negotiate when raising its discount rate stand unrefuted. This "take-it-or-leave-it" approach described by the trial court, when contrasted against the express representation that changes would be renegotiated, cannot be dismissed as conduct outside the scope of the Consumer Fraud and Mortgage Brokers acts. The trial court therefore erred in granting summary judgment for Western American.

■ Since this matter must be remanded, we will, for guidance of the trial court, proceed to discuss some of the other issues presented. The next issue is whether Western American could be sued under the Consumer Fraud Act, the Mortgage Brokers Act or both. Western American's actions, viewed in a light most favorable to the state, seem to fit squarely within the parameters of conduct proscribed by the Consumer Fraud Act.

Western American argues, however, that action under the Consumer Fraud Act is preempted under *Green Acres Trust, supra*, which states that the attorney general does not have jurisdiction to seek relief under the Consumer Fraud Act where other "particularized and comprehensive legislation pervades a specialized field of consumer protection." 127 Ariz. at 168, 618 P.2d at 1094. Here, the specialized protection to which Western American alludes would be from the Mortgage Brokers Act.

The state argues that by amending the Consumer Fraud Act immediately after the *Green Acres Trust* decision to ensure the act is considered a cumulative remedy, the legislature told the court that its conclusion of preemption was wrong. Therefore, it concludes, the court should overrule *Green Acres Trust*. We disagree with the state's argument and its conclusion.

The Arizona Supreme Court, in *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 667 P.2d 1304 (1983), did state that the amendment to the Consumer Fraud Act mandated the conclusion that the act was intended as an additional source of relief. 136 Ariz. at 592, 667 P.2d at 1307. The court refused, however, to permit retrospective application of the amendment. 136 Ariz. at 593–94, 667 P.2d at 1308–09. It reaffirmed the general rule that absent a plain indication that a statute was intended to operate retroactively, only prospective operation will be given. *Id.* The court stated that it had found nothing to support a retrospective application. *Id.* This is consistent with A.R.S. § 1-244, which declares that "No statute is retroactive unless expressly declared therein."

Although *Green Acres Trust* does control here (see footnote 4), it does not in our opinion preclude the attorney general from maintaining an action under the Consumer Fraud Act. In *Green Acres Trust*, the court found that the Securities Act preempted action under the Consumer Fraud Act because the Securities Act, A.R.S. §§ 44–1801 to –2065 (1974 & Supp.1974–1984), was comprehensive and detailed legislation designed to regulate the sale of securities. 127 Ariz. at 165, 618 P.2d at 1091. That situation does not exist here.

The Securities Act that was considered in *Green Acres Trust* controls what securities may be sold, *see e.g.* A.R.S. § 44–1841 (Supp.1974–1984); who may sell them, *see* A.R.S. § 44–1842 (Supp.1974–1984); and the procedures that must be completed before they may be offered for sale. *See e.g.* A.R.S. §§ 44–1892 to –1900 (1974 & Supp. 1974–1984). The Act gives the Securities Division broad investigatory powers under A.R.S. §§ 44–1822 and –1823 (Supp.1974–1984). It defines fraudulent practices in A.R.S. § 44–1991 (Supp.1974–1984) and provides for criminal penalties in A.R.S. § 44–

1995 (Supp.1974–1984). Additionally, the Act sets forth civil remedies available to sellers or purchasers of securities that do not comply with the act. A.R.S. §§ 44–2001 to –2005 (1974 & Supp.1974–1984). Actual damages, court costs and attorneys' fees are recoverable. A.R.S. §§ 44–2001, –2002. The Act also gives the Securities Division authority to issue cease and desist orders, seek injunctions and to pursue criminal proceedings through the attorney general's office. A.R.S. § 44–2032 (Supp. 1974–1984).

By stark contrast, the Mortgage Brokers Act, A.R.S. § 6–901 to –911 (1974 & Supp. 1974–1984), is designed to protect the public from the more general harms that would stem from inexperienced or unscrupulous licensees. For example, A.R.S. § 6–904 (Supp.1974–1984) requires three years' experience in the field before a broker's license may be granted. The Act explains procedures for obtaining and renewing a broker's license, *id.*, and for displaying licenses in the broker's office. A.R.S. § 6–905. The Act also provides a means for suspending or revoking the license of brokers who make false promises, substantial misrepresentations or improper disbursements. A.R.S. § 6–906. Through incorporation of banking regulations, the superintendent of banks has the authority to seek injunctions and to suspend or revoke operating permits or licenses of individuals or institutions that engage in unsafe or unsound practices. A.R.S. §§ 6–137, –138, –906 (1974 & Supp.1974–1984). The only provision of the Mortgage Brokers Act that would provide direct relief to consumers is found in A.R.S. § 6–904 (Supp.1974–1984), which requires posting of a $25,000 bond by each licensed person or firm, regardless of the number of brokers in the firm. This bond is payable to anyone injured by wrongful act, default or fraud by a broker.

Resort to one $25,000 bond is hardly the comprehensive and detailed consumer protection provided by the Securities Act. Because the Mortgage Brokers Act is not comprehensive and detailed legislation designed to provide omnibus consumer pro-

tection, the action against Western American based on the Consumer Fraud Act is not preempted by the Mortgage Brokers Act. Furthermore, *Green Acres Trust* does not preclude action under the Consumer Fraud Act merely because the regulated industry falls within the purview of an administrative agency. 127 Ariz. at 165, 618 P.2d at 1091. In fact, case-by-case analysis is required to determine whether the powers and responsibilities of the administrative body are sufficient to permit an inference that preemption would be appropriate. *Id.* We conclude that this action can be maintained under both the Consumer Fraud Act and the Mortgage Brokers Act.

We do not at this time reach Western American's arguments that the statute of limitations had run on the state's claims for restitution for individuals affected by Western American's conduct or the argument that the complaint should be dismissed because of unethical and illegal conduct by the attorney general in publicizing the filing of this action. The trial court did not reach these issues in granting summary judgment for Western American. In view of our decision, these issues should first be considered by the trial court after the parties have been afforded the opportunity to fully address such issues. Furthermore, in light of our decision, the trial court's award of attorney's fees is reversed.

Based on the foregoing discussion, the judgment for Western American is reversed and the case remanded for further proceedings consistent with this decision.

CORCORAN, P.J., concurs.

MEYERSON, Judge, specially concurring:

I agree with the disposition reached by the majority. I disagree with the analytical approach taken by the majority with respect to the applicability of the Consumer Fraud Act.

**622**

The majority concludes that the Mortgage Brokers Act is not a comprehensive and detailed legislation designed to provide consumer protection and therefore does not preempt the Consumer Fraud Act. The majority relies upon the decision in *Green Acres Trust* to substantiate its analysis. Because I believe the amendment to the Consumer Fraud Act immediately after the *Green Acres Trust* decision legislatively overruled *Green Acres Trust,* I believe it is incorrect to revive the analysis contained in that decision.

The difficulty then becomes applying the supreme court's decision in *State ex rel. Corbin v. Pickrell.* The supreme court held that the amendment to the Consumer Fraud Act providing that its provisions "are in addition to all other causes of action, remedies and penalties available to this state," should be given only prospective effect. The supreme court relied upon the general rule that a statute will be given prospective operation only absent a plain indication of legislative intent that it operate retrospectively. 136 Ariz. at 593–94, 667 P.2d at 1308–09. I respectfully disagree with the application of this principle to the Consumer Fraud Act amendment because in my opinion, it is clear that the legislature intended the amendment to apply retroactively.

The supreme court correctly recognized that the legislative action stripped the holding in *Green Acres Trust* of its "foundation." 136 Ariz. at 592, 667 P.2d at 1307. Thus, the amendment was "curative" in nature in that it was designed to remedy the effect of the *Green Acres Trust* decision. If the legislative action is viewed in this light, it is apparent that the intent of the legislature was to restore to the Consumer Fraud Act its broad remedial purpose and to "repeal" the limiting effect of *Green Acres Trust.* Curative legislation of this nature is generally given a retroactive effect. *See generally 2 C. Sands,* Statutes and Statutory Construction § 41.01–.22 (4th ed. 1973).

In my opinion, the legislature decreed that *Green Acres Trust* was incorrect.

Therefore, at the time of the acts in question herein, the Consumer Fraud Act constituted a supplemental remedy which the state could legitimately utilize. Because the retroactivity of the Consumer Fraud Act amendment may be important in other pending cases, I urge the supreme court to reconsider its decision in *State ex rel. Corbin v. Pickrell.*