IT IS HEREBY ORDERED that the defendants' motions to dismiss be and are GRANTED.

IT IS FURTHER ORDERED that plaintiff's complaint be and is DISMISSED without prejudice.

Michael BINGHAM and Peggy Bingham, Plaintiffs,

v.

COLLECTION BUREAU, INC., and Collection Bureau of North Dakota, Ltd., Defendants.

No. A1–79–131.

United States District Court,
D. North Dakota,
Southwestern Division.

Jan. 12, 1981.

See also D.C., 493 F.Supp. 701.

Monte Engel, Staff Atty., Legal Assistance of North Dakota, Devils Lake, N. D., for plaintiffs.

Christine Hogan and Patrick W. Durick, Bismarck, N. D., for defendants.

## MEMORANDUM and ORDER

VAN SICKLE, District Judge.

This is an action by consumers, Michael and Peggy Bingham, against two related collection agencies, Collection Bureau, Inc. (CBInc), and Collection Bureau of North Dakota, Ltd. (CBLtd) for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

Plaintiffs allege that the defendant CBInc violated the act in the following particulars:

a. Failure to give the written notice required by 15 U.S.C. § 1692g.

b. The making of an unconscionable interest claim in violation of 15 U.S.C. § 1692f(1).

c. Harassment by annoying telephone calls in violation of 15 U.S.C. § 1692d(5).

d. Extortion by threat of imprisonment in violation of 15 U.S.C. § 1692e(4).

e. Harassment by false threats of intent to take legal action in violation of 15 U.S.C. § 1692e(5).

f. Slanderous representations that debtors were committing a crime in violation of 15 U.S.C. § 1692e(7).

g. Falsely threatening nonjudicial attachment and garnishment in violation of 15 U.S.C. § 1692f(6).

h. False and deceptive means to collect a debt by using two corporations with deceptively similar names in violation of 15 U.S.C. § 1692e(10).

They alleged that the defendant CBLtd violated the act in the following particulars:

a. That the notice system used by CBLtd used false, deceptive and misleading language in violation of 15 U.S.C. § 1692e.

b. That CBLtd, by its notice procedure, was guilty of "flat rating" in violation of 15 U.S.C. § 1692j.

The defendants generally deny all allegations of wrongdoing. They deny that CBLtd is a "flat rater," and allege conscientious efforts to obey the spirit and language of 15 U.S.C. § 1692, et seq. (Fair Debt Collection Practices Act), while still performing their economic obligation of liquidating bad debts.

## FACTS

Jarvis Broeckel began working for the Credit Bureau of Bismarck about 1972. His principal activity was as a collector. About 1973, with another employee, he bought the Credit Bureau of Bismarck. He owned 49% and his co-owner owned 51% of the stock. In late 1973 he organized Collection Bureau of North Dakota, Ltd., a North Dakota corporation. In June 1977, the associates separated. Mr. Broeckel bought the collection business, and his associate bought the Credit Bureau. At that time, Mr. Broeckel organized Collection Bureau, Inc. The stock in the corporations is held:

| | | |
|---|---|---|
| Collection Bureau, Inc. | 100% | Mr. Broeckel |
| Collection Bureau of N. D., Ltd. | 95% | Mr. Broeckel |
| | 5% | Mrs. Broeckel |

Mr. Broeckel is the controlling officer of both corporations. He immediately began plans for automation. He completed his automation, to computer, by June 18, 1979. As is developed later, the collection activities herein complained of occurred during and immediately after completion of the automation.

Mr. Broeckel was active in collector's associations, and so was cognizant of the passage of the Fair Debt Collection Practices Act. As a member of such associations he attended seminars regarding the Act, and prepared his employees for the restrictions imposed by the Act prior to its effective date (March 20, 1978). As the material became available, he required his collector personnel to review the current "Manual on Fair Debt Collection Practices Act" published by the American Collectors Association, Inc. This study, coupled with on-the-job training, and a telephone monitoring system, constitute his program intended to assure that any violation would be unintentional, and would occur despite procedures designed to avoid such violations.

Michael and Peggy Bingham are a young married couple who must rely on the unskilled labor market for their livelihood. They have two children, Rebecca, born in 1977, and Robert, born in 1978. Peggy Bingham, who claims substantial damages to her personality by virtue of the conduct of the collectors, is 22 years old, obese, doll like, described by a psychologist witness as unsophisticated, immature, with limited ability to act without a leader, having an inadequate dependant personality. In 1977 they were living in Brinsmade, North Dakota. Rebecca was born in Mercy Hospital, Devils Lake. The Binghams had made several payments on current services but the 1977 bill and several subsequent accounts had been written off by the creditor hospital, and set over for collection.

March 23, 1979, Mercy Hospital sent to CBLtd a list of accounts for collection. The accounts, due by the Binghams, as transferred showed a balance of $958.65 due, included no loading for interest, and were computed from the hospital records by the hospital finance officer, Mr. Lindell (see exhibits 6 and 47). Since, at that time, the computer operation was not installed, it was set up on a control card (see exhibit 38). Both parties have agreed that the first notice of a five notice system was sent and received sometime between March 23, 1979 and April 24, 1979.

> First was the "Urgent" notice (exhibit 46).
>
> April 24, 1979 the "Past Due" notice was sent (exhibit 2).
>
> April 24, 1979 the "Please Take Notice" notice was sent (exhibit 3).

(Why they were sent out the same day was never satisfactorily explained except for the suggestion this occurred during the change-over from manual to computer record keeping.)

> May 5, 1979 the "Avoid Further Action" notice was sent (exhibit 4).
>
> May 14, 1979 the "Notice of Further Action" notice was sent (exhibit 5).[1]

These five notices had in common:

> a. They showed CBLtd as mailer.
>
> b. They directed payment to Mercy Hospital.
>
> c. They showed the balance due as 958.-65.

CBLtd sent these notices out for a fee of $4.95. They were sent with an understanding between the hospital and the collector that upon completion of the five notice series, the hospital, if it assigned the account for more aggressive collection, would assign it only to CBInc. CBInc took such assignment on a fee schedule which was computed at one-third for collection prior to authorization to sue, and fifty percent if the creditor did in fact authorize suit.

The five notices elicited no response from either plaintiff. Mr. Bingham explained that:

---

1. The forms of the five notices used are attached as Appendix 1, 2, 3, 4, and 5.

"I had heard from other guys it was hard to talk to the management at Devils Lake so I didn't try."

Mrs. Bingham asserted that she had no recollection of receiving the first notice. She received the second and third cards at the same time. And from the language of the fourth card she perceived a threat to put her in jail. She interpreted the fifth notice as a threat to bring a civil action to collect, carrying it to judgment if necessary. The first payment made in 1979 was made on June 1, 1979. It was received by the hospital and credited to a more recent account which had not been written off as a bad debt and set over for collection.

At the conclusion of the five notice program, CBLtd, then partially automated, ran a printout report on the results of the five notice system (see exhibits 16 and 55). One copy of the printout (exhibit 55) was returned about June 20, 1979 with directions to go forward with the next collection stage, that is, the telephone collector stage.

This stage called for skip tracing the debtor to determine whether telephone contacts were possible, and to gather information which would assist in a recommendation to sue or not to sue out the account, while exerting telephonic pressure to effect collection. This stage and the litigation stage were both handled under the name of CBInc.

Upon the return by Mercy Hospital of the Bingham account, with directions to proceed, a control card was made (see exhibit 38). The manual control system and the computer were jointly used, at least until August 1, 1979, in order to assure everyone that the computer system worked. The card was delivered to Vickie Eichbaum, a skip tracer, who traced the Binghams to Maddock, North Dakota. Michael Bingham answered the call to the Maddock number.

In keeping with well established policy the skip tracer, immediately upon learning that she was talking to the debtor, transferred the call to Jerry Huseby whose telephone alias [2] was "Mr. Mattson." The call should normally have gone to Clyde Hardesty whose telephone alias was "Mr. Hager," because Mr. Hardesty was handling the debtors' names from A to F.

Mrs. Bingham testified precisely and consistently as to the time, circumstance, and language of each telephone call. In fact, on cross examination she was unable to discuss the calls except in the order of her recital, thus communicating the suggestion of rote, rather than recollection testimony. Mrs. Bingham testified:

That all calls except the call-back of June 19, made at 10:30 to 11:00 p. m., were made at 10:30 to 11:00 a. m., and she knew this because they all came while she was preparing potatoes for lunch. That the caller always gave his name (alias), the name of his employer (CBInc.), and the name of the account (Mercy Hospital).

She testified to a total of 14 calls as follows:

1.  June 11, 1979, Monday. First call, a woman may have asked her to hold. Then Mr. Mattson stated he was calling for Mr. Hager. Stated it was about the hospital bill, amount $958.65, inquired about deposits, land, stock, inheritance, jewelry, "do you have a wedding ring?" Told her unless she paid her bills she could go to jail. Asked to have her husband call back.

2.  June 18, 1979, Monday. Mr. Hager called. Inquired where Michael worked, she told him but told him not to call the place of work. How much he made. She told him $120.00 a week. Asked for one whole check. She said she could not. Asked for $70.00 from each check. She offered $10.00 per week. He stated that was not enough.

2.  The Department of Banks and Financial Institutions of North Dakota administers the Collection Agency Statutes, 13–04–02, et seq., N.D. C.C. Neither this statute nor the regulations issued pursuant to it provide for aliases.

It seems that defendants are the only known agency which uses aliases, and for that reason counsel for the Department required the defendants to list the aliases used and the persons using those aliases.

3. June 19, 1979, Tuesday. Mr. Hager called. Said $10.00 was not enough. Said she shouldn't have children if she couldn't afford them. She told him that she, a Catholic, couldn't break her marriage vows.

4. June 20, 1979, Wednesday. Mr. Hager called. Wanted them to borrow the money.

5. June 21, 1979, Thursday. Mr. Hager called. Wanted to be paid right now.

6. June 25, 1979, Monday. Mr. Hager called. Told her to borrow from her parents. Unless paid he would garnish their wages and would have papers served on them.

7. June 26, 1979, Tuesday. Mr. Hager called. Urged them to borrow. Threatened garnishment.

8. June 27, 1979, Wednesday. Mr. Hager called. Said pay by July or else we will serve papers and garnish.

9. June 28, 1979, Thursday. Mr. Hager called and asked if she had the money. She said no.

10. June 29, 1979, Friday. Mr. Hager called.

11. June 29, 1979, Friday. Mr. Hager called in the evening.

12 & 13. July 6, 1979, Friday (long 4th of July weekend). Mr. Hager called. Michael Bingham answered. Hung up. Hager called back in a few minutes. Peggy's mother answered. Told Hager she was paying the phone bill and he was not to call on her phone again.

14. July 11, 1979, Wednesday. Mr. Hager called. She told him "anything further, call my lawyer."

Jerry Huseby (Mattson) testified that he spoke to Peggy on June 11. That despite the policy to record all debtor contacts, he did not record on either the account card (exhibit 38), or the computer (exhibit 45), this call. He denied he has ever threatened any debtor, including Peggy, with "going to jail." He denied any reference to a wedding ring. He knew his call occurred before June 20, 1979, because he had no computer picture to work from. He knew that he was subject to being monitored on the phones, and he had studied the manual.

Clyde Hardesty (Hager) stated that he was on vacation June 2 through 18, 1979. That he knew he was subject to telephone monitoring; that he called at the most on any account every other day. That he realized the danger of a claim of harassment, and as a business man he knew that given the work load of a collector, in excess of 100 calls a day, even an account this size could not be worked more often than every second or third day. He recalled two contacts on the 28th of June, and two contacts on the 11th of July. One was the call-back when he talked to Peggy's mother and one was a late call as authorized by Peggy. He did not always record no-answer calls. He denied using profanity. He denied calling to harass.

As part of the investigation addressed to finally deciding whether to recommend assignment for purposes of suit a collector must inquire into:

Assets, land, savings, investments, including jewelry, employment, wages, capacity to borrow, etc.

He denied making any call on June 19, 1979. He claimed he never has and never would have told a woman she should not have children unless she could afford them. He denies he called on June 20, 1979. He would tell a debtor that legal action to enforce a claim was a possibility and such an action could result in judgment and garnishment in aid of execution. He does ask if a young debtor can get help from parents. He did not and would not tell a debtor that it was illegal to refuse to pay a debt and he or she could go to jail.

On July 2, 1979 he recommended an assignment of the Bingham account and when it was returned to him, in the usual manner referred the claim to the legal department for suit. Return of the assignment began the third stage, reduction of the claim to judgment. In the course of this stage, Binghams received a notice of referral for action (see exhibit 1).

■ Plaintiffs claim a fraudulent loading of the interest because the original interest was computed from May, 1977 instead of being computed at reduced balances as certain payments were made. However the defendants did compute the interest at the legal rate from the date of last entry as reported by the hospital. And the hospital admission form called for the imposition of interest. I find no substantial error on the part of the defendants.

The following payments were made in the course of the collection efforts:

June 20, 1979  $10.00  paid to hospital
June 26, 1979  $10.00  paid to hospital
July 03, 1979  $10.00  paid to hospital
July 19, 1979  $10.00  paid to hospital
July 25, 1979  $10.00  paid to hospital

This extended recital of the facts is made because of the numerous issues raised as to the application of a statute that has heretofore received little judicial interpretation.

### GENERAL PRINCIPLES

In 1977 a new title was added to the Consumer Credit Protection Act. It was the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, which is in the tradition of "social legislation" so dear to the heart of William O. Douglas. His attitudes have been reflected in the approach and policies of the Federal Trade Commission since the days when he headed it in the early 1930's.

It was in keeping with this tradition that the statute was drafted for administration by the Federal Trade Commission. It is clearly addressed to protecting the weak and unsophistical debtor from abusive, dishonest and sharp collection practices. The initial paragraph of the statute reads:

15 U.S.C. § 1692(a). "There is abundant evidence of the use of abusive, deceptive and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."

■ In view of these facts I conclude that prior Federal Trade Commission rulings and attitudes are relevant to a proper analysis and application of this statute.

"In evaluating the tendency of language to deceive, the commission should look not to the most sophisticated readers but to the least." *Exposition Press, Inc. v. F. T. C.*, 295 F.2d 869 at 873 (2d Cir. 1961)

■ And I also conclude that the standard of ability and conduct to which the debtor is held is on the low end of the spectrum of the "reasonable person."

However the framers of the statute recognized that the vast majority of the collectors are ethical persons and a purpose of the act was not to impose unnecessary restrictions on ethical debt collectors. U.S.Code Cong. & Admin.News, 1977, Vol. 2, pp. 1695, 1696.

The drafters recognized that:

"Unlike creditors, who generally are restrained by the desire to protect their good will when collecting past due accounts, independent collectors are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them." U.S. Code Cong. & Admin.News, supra, p. 1696.

But, nevertheless, the abrasive persuasive collector is the adverse side of the coin of the unctuous persuasive credit extender, and the statute must be considered with that fact in mind.

■ Finally, in evaluating whether a given language choice tended to deceive, I will apply the principle that actual consumer testimony is not necessary in evaluating the tendency of language to deceive. *Exposition Press, Inc.*, supra, p. 872.

This is the approach used by Judge McMillen in *Rutyna v. Collection Accounts Terminal, Inc.*, 478 F.Supp. 980 (N.D.Ill. 1979), see page 982, paragraph 3.

■ But I must work from some standard. While I appreciate the truth in Chief Justice Hughes' comment regarding judicial

reasoning,[3] unless some standards for determination are developed, rulings at the trial level will be little more than separate mirrorings of personal bias. I feel a proper standard is whether it is more likely so than not so that debtors on the low side of reasonable capacity who read a given notice or hear a given statement read into the message oppressiveness, falsehood or threat.

## FINDINGS AND CONCLUSIONS

15 U.S.C. § 1692k, Civil Liability provides:

"(c) A debt collector may not be held liable under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

██ I find, generally, that a program of constant on-the-job training, coupled with telephonic monitoring, supervision, and reference to a standardized manual is a procedure reasonably adapted to avoiding violations of the act.

I find as a fact that CBLtd and CBInc operated in the collection business as one "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

I find further that this debt collector had a program of debt collection which encompassed:

a. Persuasion by mail, at a minimum cost to the creditor and minimum work by the collector; which if unsuccessful, was followed by,

b. Personal telephonic contacts by the collector at a substantially increased cost to the creditor and substantially increased work by the collector;

at which point, if the information garnered by the collector and available to both the creditor and the collector caused them to concur,

c. The account was assigned for collection by civil process including reduction to judgment and procedures in support of execution of the judgment.

██ This finding resolves the issue of the charge of "flat rating" in violation of 15 U.S.C. § 1692j(a) which provides:

"It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating."

Because, given the program which the creditor and collector were committed to, the belief on the part of the consumer that the collector was engaged in an attempt to collect the debt was not false.

██ But this finding also confirms my earlier finding (Memorandum and Order dated April 9, 1980) that the 30 day notice mandated by 15 U.S.C. § 1692g(a)(4) should have been contained in the first mailed notice. The purpose of that 30 day notice is to:

"Eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid."

Turning to the specific mailed notices, and the specific claim that the five notice system communicated false, deceptive and misleading representation: All such conduct is in violation of 15 U.S.C. § 1692d. Relevant portions of 15 U.S.C. § 1692e provide:

"A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

.    .    .    .    .

3. "Justice Douglas you must remember one thing. At the constitutional level where we work, ninety percent of any decision is emotional. The rational part of us supplies the

reasons for supporting our predilection." This is Judge Douglas' basis for his "gut reaction" observations.

The Court Years, W. O. Douglas, p. 8.

(2) The false representation of—
  (A) the character, amount, or legal status of any debt; or
  (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

. . . . .

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

. . . . .

(13) The false representation or implication that documents are legal process."

■ Form No. 1, as mailed in the Bingham case,[4] does violate 15 U.S.C. § 1692e in that it asserts that the creditor is a member of CBLtd, which carries with it an implication of wholesale distribution of credit information and generalized assistance in credit matters.

Form No. 2 contains the same false assertion that the creditor is a member of the collection organization. Otherwise I find no violation of the statute as to it.[5]

■ Form No. 3 contains the same false assertion of membership. The warning that failure to pay would place the account in "jeopardy" is self-evidently true; and since no adverse consequences of the "jeopardy" were articulated, the form does not make a false representation.

Form No. 4 recites "Avoid Further Action." Plaintiffs claim this language is a violation of 15 U.S.C. § 1692e(5) in that it is a threat of civil action that is not intended to be taken. In *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212 (9th Cir. 1979), cited by the plaintiffs, the collector sent a notice which said in part:

"Failure to appear ... may result in immediate litigation by our client with ultimate seizure of property, auto, bank accounts ... if judgment is obtained."

This message was sent by a flat-rater on a format which closely resembled a telegram and was one of a series which specifically talked about litigation, seizure, judgment, employment of counsel, and liability.

■ I find that the *Trans World Accounts* notices exceeded by far the language pattern of these notices and particularly the language of Form No. 4. "Action" is a positive, emphatic, word. But its use cannot be completely denied to a collector because others have used it with specific reference to the judicial process.

■ Form No. 5 inquires if recourse to a collection bureau will be the only alternative, and advises that the notice is final. The meaning may be either the last notice, or the debtor's last chance to stop the collection process before some more stringent step is taken. This language invites the conclusion that suit will be considered. It neither says nor invites the conclusion that suit has been decided upon. Plaintiffs raise the same claim of violation of law as was raised to exhibit 4. Again, the CBLtd program contemplated going forward to an aggressive telephone collection effort if the notice procedure failed. Thus I find the notice was not fraudulent.

Before evaluating the lawfulness of the telephone contact program, a few general observations are in order:

The telephone collectors who testified had certain characteristics in common. They were all young, competent verbalizers, with resonate voices and an authoritative manner of speech. They had better than average intelligence and had a touch of arrogance and of ruthlessness.

Telephone contacts as distinguished from personal contacts, while more efficient in

---

4. The decision of the Memorandum and Order dated April 9, 1980 was not based on Form No. 1 discussed here.

5. Note that the error in balance due which was generated by exhibit 6 is consistently repeated throughout the five notice program.

terms of number of contacts made, and increased gross collections, are less efficient in terms of excellence of each contact, and extent to which an accurate evaluation of the debtor's situation, capacity, state of mind, etc., can be made.

Statements made and language used in a telephone contact can be and often are more oppressive than the same communication made in a face to face situation.

Plaintiffs claimed a total of fourteen calls. Defendant stated that the policy, subject to judgment decisions of the collector, was to average not more than one call every other day. "Hager" also claimed that aside from the opening call taken by "Mattson" he was on vacation and unable to make that many calls. "Mattson" took the call of June 11. "Hager" was absent until June 18. "Hager" stated he must have been absent until June 24 because he bought gas in North Sioux City, South Dakota, on June 22, and in Fargo on June 23. But the calls were logged on June 21 and June 25. "Hager" could easily have driven to North Sioux City, South Dakota, on the week end of June 21, leaving after work on Thursday. The Binghams made their first remittance generated by the collection effort on June 20. This payment was more likely caused by calls on June 18 and June 19, than the week old call of June 11. And while all telephone contacts are supposed to be logged, admittedly the call records on the computer printouts are not accurate (see exhibits 13 and 45).[6]

Finally, fourteen calls between June 18 and July 11 is about one call every other day. So I conclude that it is more likely so than not so that the schedule of calls reported by Peggy is accurate.

Plaintiffs claim harassment was evidenced by the number of calls and the time of day of the calls. 15 U.S.C. § 1692d(5) describes the violation of:

"Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."

██ The calls came in a pattern of four days of calls, then four days of no calls. The calls produced results in terms of payments, and neither Peggy nor Michael told the caller to stop calling until July 11, when he did stop.

So I find no harassment in the number of calls.

As to the time of day of the calls, 15 U.S.C. § 1692c(a)(1) provides that generally a debt collector may not communicate with the debtor:

"at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antimeridian and before 9 o'clock postmeridian, local time at the consumer's location."

I interpret this statute to apply to telephonic communications.

The June 29 evening call was at the suggestion of Peggy. It was not harassment. It was not at an unreasonable time.

██ The July 6 call was terminated when Michael hung up after both parties were identified to each other. The recall came immediately. That was harassment.

As to the contents of the calls: My conclusion that the calls were made does not include a finding as to the contents of the calls.

As to the call of June 11, and the reference to the wedding ring. Inquiry as to the assets of the debtor is a necessary step for a collector to take. Inquiry as to jewelry, including rings, is not surprising in light of the current news coverage of the liquidation of jewelry because of the inflationary price of gold. I conclude that an inquiry as to assets including jewelry, for example, wedding rings, was made. But the inquiry was not interpreted as the inquirer intend-

6. The coded comments on these two printouts are consistent with one another, but the code was changed soon after the computer was put in operation (see exhibits 41 and 42).

ed. This is an example of the risk of telephonic communications with the less sophisticated. The applicable statute to this situation is the general prohibition against harassment, 15 U.S.C. § 1692d.

■ I conclude that a telephonic inquiry by the collector about personal jewelry, which includes references to highly personal items like wedding rings, does have a natural consequence to harass, and therefore find it was harassment.

As to the threat of "going to jail." Peggy first claimed the threat was embodied in Form No. 4, then she found it again in the call of June 11. I conclude that her testimony as to this threat is not reliable.

■ As to the call of June 19, and the claimed statement by "Hager" that Peggy should not have children if she could not afford them. This call was one covered by Peggy's testimony from notes. This remark is not the kind which would have been pulled out of thin air by the witness. Her claimed response that she protested she could not violate her marriage vows shows she may be coloring the original remark by her recollection of the response. I conclude that some remark to that sense was made. I also conclude that any remark of that tenor in a telephonic collection contact is egregious and that the remark was harassment.

As to the claim of repeated threats of garnishment not in aid of execution. Peggy admitted she kept no notes of what was said after the first few calls, and her recollections ran together. Cross examination of the collectors demonstrated that they were sensitive to the risk of oppression by inaccurate and repeated threats of judgment, garnishment, attachment, etc., all of which can only follow a decision to sue, a successful suit, and proper procedures in aid of execution of a judgment.

■ But a discussion of the ramifications of suit does have its place in collection dialogues. I conclude that the plaintiffs have failed to establish that they suffered harassment and abuse because of improper discussions by the collector, of the possibility, and forseeable consequences of civil action to collect.

There remains the problem of the use of aliases by telephonic collectors. As pointed out before, a telephone contact is an impersonal contact, and is a frustrating and disruptive experience for the unprepared recipient of the call.

Further, the lack of visible contact shields the caller and invites an aggressive caller to overreach. The risk of this sort of overreach is not so great where the conferees meet face to face. But it is greatly increased when the telephonic caller uses the additional shield of an alias.

The telephonic collector justifies the use of an alias to protect himself from abusive return calls to his office, home, etc. But a telephonic collecting technique which produced a substantial body of such reaction would be, for that reason, suspect.

■ I conclude that the use of an alias by a telephonic collector is conduct the natural consequence of which is to harass, oppress or abuse the debtor in connection with the collection of the debt.

## LIABILITY

Again, 15 U.S.C. § 1692k(c) provides that: "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

This action was brought against only Collection Bureau, Inc., and Collection Bureau of North Dakota, Ltd.

■ As to all of those findings adverse to the defendant except that dealing with the use of aliases, I find that the debt collector, specifically the management of the corporation, has shown by a preponderance of the evidence that the violation was not intentional on the part of the corporate collector, but has not shown that it resulted from bona fide errors of its agents. Therefore, liability attaches.

As to the use of aliases, I find that the management of the defendants did show by a preponderance of the evidence that the violation was not intentional and did result from bona fide error, namely, that it assumed it was in compliance with the law in the use and reporting of aliases, therefore, liability for past use of aliases does not attach.

## DAMAGES

15 U.S.C. § 1692k provides in relevant part:

"(a) Except as otherwise provided in this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of such failure;

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; . . .

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

(b) In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors—

(1) in any individual action under subsection (a)(2)(A) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional; . . . . "

## ACTUAL DAMAGE

The psychologist who testified as to damages based his findings on two hours of observation, including some psychological testing, which occurred a substantial interval after the collection efforts stopped.

He concluded the period of the damage was about a year, that during the year she was no longer childlike in her happiness, that she had lost her interest in housework, that she was not paranoid, but distrustful of telephones. That her sleep was disturbed, she had nightmares, headaches, a sensitive stomach, and was prone to cry. He accepted her statements at face value and despite her obvious physical problems, concluded without further investigation that all her physical problems were psychosomatic, and caused by the wrongful acts of the telephone collectors. The proof of that claim is much too weak to accept.

Peggy herself testified that after the first call she "cried and cried and cried and cried." Her husband said she was still crying when he came home at noon on June 11, 1979.

But the impression that Peggy the witness communicated was that her crying was an habitual response to any difficult situation, and that it continued interminably until something occurred to divert her attention. Nor did the witness demonstrate any excessive depression or unstable personality traits during the several days of trial. She gave instead the impression of one who had always been over protected and had learned how to demand attention and protection from those around her.

I conclude that she suffered no permanent ill effects from the experience of the calls, and that most of her crying was habitual or cosmetic. However, she is of the group to be protected and she has suffered injury.

I find Peggy Bingham has suffered actual injury in the amount of $1000.00. I find Michael Bingham has suffered loss of consortium and therefore actual injury in the amount of $100.00.

Pursuant to 15 U.S.C. § 1692k(a)(2) and (b)(1), I find that the false statements

in the notices and the harassment and abuse in the telephone calls were not frequent and persistent, but were intentional acts by the agents of the defendant, therefore, I assess additional damages in the amount of $400.00.

Pursuant to 15 U.S.C. § 1692k(a)(3), costs and attorney's fees will be allowed to the plaintiffs. Plaintiffs will prepare, serve and file an affidavit of costs and attorney's fees with a motion for allowance under the local rules.

IT IS SO ORDERED.

This Memorandum and Order is deemed to satisfy the requisites of Rule 52 of the Federal Rules of Civil Procedure.