In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-467 CV


____________________



IN RE BETTY DALCO






Original Proceedings






OPINION


 Relator, Betty Dalco ("Dalco"), seeks mandamus relief from the trial court's order
disqualifying her trial counsel, Kimberly Soard, and Soard's law firm, for breach of
confidentiality and conflict of interest. The order was the result of a motion to disqualify
filed by the plaintiff/real party in interest in the underlying lawsuit, Citibank (South Dakota)
N.A. ("Citibank"). Each party contests the factual representations of the other. 

 The factual background of the underlying suit indicates that Citibank extended a line
of credit to Dalco and issued her a credit card. Citibank alleged that Dalco defaulted in
making payments on charges made to the line of credit thereby violating certain terms
contained in a "Card Agreement." Citibank proceeded to accelerate maturity of the total
amount due on the account, an amount alleged to be $14,710.27. The manner of notice to
Dalco of her default allegedly included what Dalco described as harassing telephone calls
to her home from a collection agency (Regent & Associates) employed by Citibank. 
Ultimately, Citibank filed suit against Dalco for breach of contract to recover the amount that
Dalco was alleged to owe, and for quantum meruit. 

 Dalco hired Kimberly Soard to defend her in the underlying suit. Soard has been in
private practice since February 2005. Prior to that time, Soard was "Executive Vice
President/General Counsel" for Universal Fidelity Corporation ("Universal"), a nation-wide
company engaged in commercial and consumer debt-collection. She was employed by
Universal for over six years. According to her resume, filed by Citibank as an attachment
to its motion to disqualify, Soard directly supervised the legal department at Universal, and
indirectly supervised other staff. She was responsible for negotiating and drafting client
agreements, employment agreements, commercial contracts, and other corporate contracts. 
Soard's duties at Universal also included the following: 

 I provided the legal defense and/or settlement for federal and/or state violation
claims or complaints against the company, or I oversaw the legal outsourcing
of these claims - - I personally defended most lawsuits which are instituted
against our company in all states and jurisdictions where allowed[.] I was
responsible for the determining the legality of all corporate practices and
policies[.] I oversaw the establishment and continuation of all necessary state
permits and licensing[.] Also, I provided legal counsel for the corporate
officers, managers, and departmental staff members. I also am involved in all
legislative affairs and issues that affect our industry and state laws which
affected our company. (sic et passim)


 Soard's resume also indicates that while employed with Universal, she made
presentations annually at Universal corporate offices on topics concerning the federal Fair
Debt Collection Practices Act and the Texas Debt Collection Practices Act. Additionally,
while a law student, Soard did legal research on debt collection practices for the general
counsel at two separate companies. We find nothing in the record indicating Citibank
contested Soard's knowledge and experience in both federal and state debt collection law and
debt collection practices. 

 At the heart of Citibank's disqualification motion is the contention that in her capacity
as General Counsel and Executive Vice President of Universal, Soard "personally signed"
a series of commercial employment contracts between Universal and Citicorp Credit
Services, Inc. ("CCSI"), a "corporate affiliate" of Citibank, and not a party to this lawsuit. 
By the terms of these contracts, CCSI, itself a debt-collection entity and a subsidiary of
Citigroup, Inc., employed Universal "for purposes of collecting debts owed to Affiliate
Clients[.]" Entitled, "Collection Agency Agreement," each contract contained a list of
definitions, followed by nine "articles" detailing the various duties and responsibilities of the
parties under the contract. The copies of the contract appearing in the record were signed for
the years 2002, 2004, and 2005, with Soard signing as corporate representative for Universal. 

 Each of the contracts appear to be identical, with "Article 7" setting out the
confidentiality provisions in eight paragraphs. We reproduce the more pertinent portions of
Article 7 as follows:

 7.1 In performing this Agreement, [Universal] will have access to information
that is confidential and proprietary to CCSI. Such information may include,
without limitation: names, addresses, demographic/behavioral/credit
information relating to customers of affiliated clients; marketing strategies,
targeting methods, and other CCSI business objectives. [Universal] shall use
such information only for the purpose of providing the services required by
this Agreement and shall not accumulate in any way or make use of such
information for any other purpose. [Universal] shall ensure that only its
employees who need to know such information to perform the services
required by this Agreement will receive it, and that such employees shall agree
to be bound by the provisions of this Article. . . . 


 7.2 The obligations imposed on [Universal] shall not apply to information that
[Universal]: already knew; received from a third party who had the right to
disclose it; was authorized by CCSI to disclose; developed independently;
obtained from the public domain; or was required to disclose by a court of (sic)
governmental agency with appropriate jurisdiction.


 . . . .


 7.5 Citigroup subsidiaries and affiliates have made a formal promise to their
customers regarding the use of certain financial information. A copy of that
formal Privacy Promise is attached as Exhibit C. [Universal] agrees to not do
anything that would cause CCSI to violate the terms of the Privacy Promise. 
Notwithstanding any other provision of this Agreement authorizing CCSI to
audit [Universal's] performance of this Agreement, CCSI shall have the
independent right to audit [Universal's] compliance with the requirements of
this section of the Agreement. 


 7.6 Both parties agree to abide by and comply with all state and federal laws
regulating privacy of information related to customers of affiliated clients. 
And the parties agree to conform their conduct to comply with such laws
regardless of any term or requirement otherwise set out in this Agreement. 


 Article 9 of the contracts contained certain "general" provisions, with paragraph 9.1
including the following language:

 9.1 [Universal] and CCSI understand, acknowledge and agree that CCSI is not
selling any accounts, or any underlying debt concerning the referred accounts,
to [Universal] by virtue of this Agreement. Instead, CCSI is retaining
[Universal] as an independent contractor, as that term is defined by applicable
state and federal law including the Internal Revenue Code, for the exclusive
purpose of collecting delinquent account balances on accounts owned by
affiliate clients. Subject to the terms of this Agreement and Exhibit A,
[Universal] understands and agrees it has the right to determine the method and
manner of achieving the result for which it is being retained. Nothing in this
Agreement shall be deemed to permit CCSI to manage . . . [Universal's]
business affairs. 


 Citibank filed with the trial court, as well as with us, a large number of documents for
in camera inspection in support of its disqualification motion. Citibank designated all of its
in camera material "highly-confidential and proprietary." However, a number of documents
included in this material are public records as they are copies of papers and deposition
testimony from a suit filed in Yoakum County, Texas, in which Soard represented Universal
in her capacity as corporate counsel. Other than indicating Soard was actively involved as
corporate counsel for Universal, something which Dalco does not contest, Citibank fails to
inform us what further relevance the Yoakum County litigation documents have vis-a-vis the
disqualification of Soard as Dalco's counsel. 

 Apart from the series of CCSI/Universal employment contracts discussed above, the
remainder of the in camera material appears to be proprietary-type documents. These
proprietary-type documents appear under Tabs 9 and 10 within the in camera material. We
have attempted to match-up these documents with Citibank's arguments contained in their
motion to disqualify, as well as with the argument presented to the trial court and the
argument contained in its response to Dalco's petition for writ of mandamus. The essence
of Citibank's position before the trial court, and before this Court, is that Soard used
Citibank's (and CCSI's) confidential information to Citibank's detriment in the Dalco
litigation, therefore "disqualification was required in light of the law protecting Citibank's
confidences." Citibank relies heavily on National Medical Enterprises, Inc. v. Godbey, 924
S.W.2d 123 (Tex. 1996). Such reliance on Godbey is misplaced as its facts are readily
distinguishable from those in the instant case. 

 Citibank's response to Dalco's petition can be summed up by the following argument: 

 Any attorney - - whether or not she represented a particular third party - - is
duty-bound to preserve the confidences of that third party where she obtains
those confidences under a confidentiality agreement. See, e.g., National Med.
Enters., Inc. v. Godbey, 924 S.W.2d 123, 129 (Tex. 1996). In such
circumstances, there is an irrebuttable presumption that "an attorney's
knowledge of a non-client's confidential information that he has promised to
preserve is imputed to other attorneys in the same law firm." Id. at 132. Thus,
not only is the subject attorney disqualified, but so is her current law firm. Id.
[at] 131-32.


(Emphasis in original). While Godbey does indeed stand for the propositions noted above,
Citibank has extracted these holdings from a complicated set of facts quite dissimilar to those
in the instant case. In Godbey, the attorney in question, Tomko, was initially retained by
National Medical Enterprises, Inc. ("NME") to provide legal counsel for two of NME's
corporate executives who were targets of a criminal investigation into NME's activities as
well as parties in related civil lawsuits. Godbey, 924 S.W.2d at 124-25. At some point
during Tomko's representation of the NME executives, Tomko joined the Baker & Botts law
firm. Id. at 124. Tomko represented both executives for about one year, but did not
represent either executive in any lawsuit. Id. at 124-25. It was undisputed that during his
representation of the NME executives, Tomko received confidential information not only
from the two individuals but also from NME as well during conferences and meetings during
which a joint defense was discussed. Id. at 125. These discussions with various individuals
and NME were undertaken pursuant to a "written joint defense agreement," signed by Tomko
as retained counsel for the two NME executives. Id. Pertinent portions of the "joint defense
agreement" are set out in the Godbey opinion, and contain the following language:

 1. Unless expressly stated in writing to the contrary, any communications
between or among any of the client members and/or the attorney members
concerning the [investigations and litigation involving NME] are confidential
and are protected from disclosure to any third party by the joint defense
privilege, the attorney-client privilege and the work product doctrine. 


 . . . .


 3. None of the information obtained by any client member or attorney member
pursuant to this agreement shall be disclosed to any third party without the
consent of the attorney member who disclosed the information in the first
instance. 


Id. (emphasis added).

 Subsequently, Tomko and Baker & Botts withdrew from representing the NME
executives. Id. Seventeen months later, Baker & Botts attorneys not involved in
representing the NME executives filed suit against NME on behalf of former patients of
NME. Id. The allegations in the new civil litigation were substantially related to the prior
criminal investigations and civil lawsuits involving NME and one of Tomko's former
executive clients. Id. at 125, 129. NME moved to disqualify Baker & Botts from
representing the plaintiffs on the ground that Tomko possessed confidential information from
NME and to which all Baker & Botts attorneys must be presumed to have had access. Id. at
126. One of Tomko's former executive clients intervened and filed his own motion to
disqualify Baker & Botts. Id. Among other reasons for denying both motions, the trial court
found that (1) it could not be presumed that Tomko shared NME's confidences with other
Baker & Botts attorneys because neither Tomko nor Baker & Botts represented NME, (2)
that Baker & Botts was not disqualified unless it owed NME a duty of loyalty because of its
representation of the two NME executives or the joint defense agreement, or (3) that Baker
& Botts was actually misusing NME's confidences. Id. at 126. 

 The Court initially pointed out that Baker & Botts' disqualification hinged on whether
Tomko would be disqualified had he been counsel for the plaintiffs. Id. at 128-29. 
Ultimately finding abuse of discretion by the trial court in failing to disqualify Baker & Botts
as plaintiffs' counsel, the Court first noted that the pending lawsuit was "identical in all
material respects" to the prior investigations and lawsuits that focused on NME and Tomko's
former executive clients. Id. at 129. "Had Tomko represented NME in the same matters in
which he represented [the NME executives], both he and Baker & Botts would be
disqualified from representing plaintiffs in the pending action against NME. See NCNB
Texas Nat'l Bank v. Coker, 765 S.W.2d 398, 399-400 (Tex. 1989)." Id. However, Tomko
never represented NME, only the two NME executives. As noted in In re Meador, 968
S.W.2d 346, 350 (Tex. 1998), the fact that NME was never a client of Tomko was
undisputed. "Thus, neither [Disciplinary] Rule 1.05 (protecting confidential information of
a former client) nor [Disciplinary] Rule 1.09 (prohibiting an attorney from representing a
party in a matter adverse to a former client if the matter is substantially related to the former
representation) applied." Id. at 350-51 (emphasis in original). In the instant case, it is also
undisputed that neither Citibank nor CCSI were ever former clients of Soard, in either her
capacity as corporate counsel for Universal or in her private practice. 

 The Godbey Court found Tomko's "duty" to the non-client/co-defendants, which
included NME, within the terms of the joint defense agreement that he signed as retained
counsel for the two executive/co-defendants. Godbey, 924 S.W.2d at 129. As the Court
reasoned:

 Tomko, like the other attorneys and clients participating in the joint defense,
agreed to undertake "a duty to preserve the confidences disclosed." This did
not preclude an attorney and client from acting in their own best interests, even
to the point of using information disclosed by others in ways that conflicted
with the others' interests. For example, the parties recognized that situations
could arise in which it would become necessary for them to cross-examine
each other in court. But Tomko and the other parties strictly promised not to
disclose information shared in the joint defense with third parties under any
circumstances. Thus, Tomko agreed that any communications from other
participants in the joint defense were "confidential and . . . protected from
disclosures to any third party by the joint defense privilege, the attorney-client
privilege and the work product privilege." 


Id. (citation omitted). 

 In the instant case, Citibank equates the commercial employment contract between
CCSI and Universal to the "joint defense agreement" discussed in Godbey. Such a
comparison is also misplaced. At the heart of entering into a "joint defense agreement" with
other named or potential co-defendants and their counsel is to collectively preserve the "joint
defense privilege," found in Tex. R. Evid. 503(b)(1)(C). When applicable, the joint defense
"privilege" "cloaks communications with confidentiality where 'a joint defense effort or
strategy has been decided upon and undertaken by the parties and their respective counsel.'" 
See United States v. Gotti, 771 F.Supp. 535, 545 (E.D.N.Y. 1991) (quoting United States v.
Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989)). 

 A careful reading of Godbey in light of subsequent pronouncements by the Court leads
to the conclusion that its holding was fashioned with very fine brush-strokes. Like the
disciplinary rules found applicable only to a "client" or "former client" in Meador, 968
S.W.2d at 350-51, Rule 503(b)(1)(C) appears to attach the common interest "privilege" to
confidential communications disclosed in the course of legal services rendered during some
"pending action" and "concerning a matter of common interest therein." Tex. R. Evid.
503(b)(1)(c) (emphasis added). Here, pursuant to its commercial employment contract with
Universal, CCSI provided Universal with certain confidential or proprietary information from
a variety of sources, one source being Citibank. However, this contractual relinquishment
of Citibank's confidential or proprietary information to Universal did not occur during any
"pending action" and therefore could not concern "a matter of common interest therein." Id. 
More importantly, neither CCSI nor Citibank was ever a "client" or "former client" of Soard. 
The facts are undisputed that Soard was corporate counsel for Universal exclusively and
Citibank presented no evidence that either it or CCSI were ever a co-defendant with
Universal in which shared confidences were exchanged in furtherance of a joint defense. 
Ultimately, we find Godbey's applicability to be narrowly confined to the somewhat unique
set of facts and circumstances arising in that case, but not to the starkly contrasting factual
situation before us. (1)

 "Mandamus is an extraordinary remedy, available only when a trial court clearly
abuses its discretion and when there is no adequate remedy on appeal." In re Kuntz, 124
S.W.3d 179-80 (Tex. 2003) (citing Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992)). 
A trial court's determination of factual issues "[are] entitled to deference in a mandamus
proceeding and should not be set aside unless it is clear from the record that only one
decision could have been reached." GTE Comm'ns Sys. Corp. v. Tanner, 856 S.W.2d 725,
729 (Tex. 1993) (citing Walker, 827 S.W.2d at 839-40). "In contrast, a trial court has no
discretion in determining what the law is or applying the law to the facts." Kuntz, 124
S.W.3d at 181. "Consequently, the trial court's erroneous legal conclusion, even in an
unsettled area of law, constitutes an abuse of discretion. Huie v. DeShazo, 922 S.W.2d 920,
927-28 (Tex. 1996) (citing Lunsford v. Morris, 746 S.W.2d 471 (Tex. 1988)). A party will
not have an adequate remedy by appeal when the appellate court would not be able to cure
the trial court's erroneous ruling. Kuntz, 124 S.W.3d at 181 (citing In re Colonial Pipeline
Co., 968 S.W.2d 938, 942-43 (Tex. 1998)). We have previously found that a party generally
lacks an adequate appellate remedy in disqualification cases. See Skiles, 102 S.W.3d at 326
(citing Godbey, 924 S.W.2d at 133).

 It has been repeatedly recognized that disqualification of counsel is a severe remedy. 
See In re Cerberus Capital Mgmt., L.P., 164 S.W.3d 379, 382 (Tex. 2005); In re Sanders,
153 S.W.3d 54, 57 (Tex. 2004); In re Nitla S.A. de C.V., 92 S.W.3d 419, 422 (Tex. 2002);
Spears v. Fourth Court of Appeals, 797 S.W.2d 654, 656 (Tex. 1990); Coker, 765 S.W.2d
at 400. Disqualification can result in immediate and palpable harm, disrupt trial court
proceedings, and deprive a party of the right to have counsel of choice. Nitla S.A. de C.V.,
92 S.W.3d at 422. Therefore, "'[m]ere allegations of unethical conduct or evidence showing
a remote possibility of a violation of the disciplinary rules will not suffice' to merit
disqualification." Sanders, 153 S.W.3d at 57 (quoting Spears, 797 S.W.2d at 656). While
courts often look to the disciplinary rules to decide disqualification issues, the rules are
"merely guidelines - - not controlling standards - - for disqualification motions." Nitla S.A.
de C.V., 92 S.W.3d at 422 (citing Meador, 968 S.W.2d at 350). Even if an attorney violates
a disciplinary rule, the party moving for disqualification must demonstrate that the violating
attorney's conduct caused actual prejudice that requires disqualification. Id.; see In re Users
Sys. Servs., 22 S.W.3d 331, 336 (Tex. 1999); Meador, 968 S.W.2d at 350; Ayers v. Canales,
790 S.W.2d 554, 558 (Tex. 1990). But, under appropriate facts and circumstances, a trial
court may disqualify an attorney even in the absence of any disciplinary rule violation. See
Meador, 968 S.W.2d at 351. Nevertheless, because disqualification is such a severe remedy,
the burden is on the movant to establish with specificity any alleged violation of one or more
disciplinary rules. Spears, 797 S.W.2d at 656 (citing Coker, 765 S.W.2d at 400). We
reiterate that mere allegations of unethical conduct or evidence showing a remote possibility
of a violation of the disciplinary rules will not suffice under this standard. Id. (citing Coker,
765 S.W.2d at 400). 

 In the instant case, other than a large number of filings, very little movement in the
litigation had taken place prior to the disqualification of Dalco's counsel. In response to
Citibank's suit, Dalco's counsel filed an amended answer and "Cross Claim & Request For
Emergency Injunction Hearing." In it, Dalco agrees she opened a credit card account with
Citibank, but contests the fact that she entered into any negotiated agreement regarding the
terms and conditions controlling the account. She also denies that she defaulted in making
payments on the account and denies owing any payments on the account. This pleading
further includes a portion titled, "Cross Claim Against Plaintiff & Cross Defendant Regent
& Associates LLP." (2) Dalco's suit against Citibank and Regent & Associates, L.L.P.
("Regent") alleges violations of both the federal and the Texas debt collection practices acts
with regard to harassing telephone contacts to Dalco, and requests injunctive relief and actual
and punitive damages. 

 Dalco later filed a motion for summary judgment based upon Tex. Fin. Code Ann.
§ 392.306 (Vernon 1998), which provides: "A creditor may not use an independent debt
collector if the creditor has actual knowledge that the independent debt collector repeatedly
or continuously engages in acts or practices that are prohibited by this chapter." Dalco's
summary judgment facts rely on her experiences with Regent's personnel as well as on the
experiences of other litigants represented by Dalco's counsel in unrelated litigation against
both Citibank and Regent also involving alleged harassing telephone contacts. Attached to
the summary judgment motion are copies of affidavits from Dalco, and from two other
individuals, all relating similar harassment-type telephone debt-collection contacts
purportedly from Regent personnel acting on behalf of Citibank. Prior to filing her summary
judgment motion, Dalco made various discovery requests, all contained in one motion. This
motion included a request for admissions, a request for "disclosure," a request for
interrogatories, and a request for production. 

 We have examined all of the various pleadings, motions, and requests filed by Dalco
and can see nothing that appears to involve or implicate any of the confidential or proprietary
information included with the in camera material submitted to the trial court in support of
the disqualification motion. We have no opinion and make no comment as to the merits of
either party's allegations in the underlying lawsuit. And, as in the usual course of any
litigation, either party's discovery requests will be subject to the standard discovery
objections and conditions. We simply find no support in any of Dalco's pleadings or other
court papers for Citibank's disqualification motion.

 Following its disqualification of Soard, the trial court filed findings of fact and
conclusions of law. The pertinent findings of fact are not supported by substantive evidence
but are mere conclusory statements. The pertinent conclusions of law are inapplicable to the
specific facts and circumstances present in the record before us. For example, the first eleven
findings of fact pertain to uncontested background facts regarding the commercial
employment agreement between CCSI and Universal. There is little mention of Soard in
these first eleven findings except to establish that she personally signed several of the
agreements "on behalf of Universal." Finding number twelve, however, reads as follows:
"Soard's central legal role as General Counsel of Universal necessarily placed her at the
center of the action where she became privy to clients' confidential information - -
information she agreed and represented she would protect and use only in furtherance of
collection efforts." First, instead of setting out specific facts clearly established in the record,
this finding begins by assuming that Soard's position as Universal's general counsel gave her
actual knowledge of Citibank's confidential or proprietary information because such a
position "necessarily placed her at the center of the action where she became privy" to such
information. (Emphasis added). 

 We are somewhat troubled by the word "necessarily" and very troubled by what, or
where, "the action" was. It is also unclear how the word "clients'" is meant to be understood. 
As previously noted, the record indicates Soard was never legal counsel to CCSI or Citibank,
nor was Soard ever involved with either entity in a joint-defense, Godbey-type of enterprise. 
Being unsupported by the record before us, finding twelve is without probative value and
will be disregarded. See In re American Home Prods. Corp., 985 S.W.2d 68, 74 (Tex. 1998). 


 The next findings of fact pertinent to the disqualification of Soard are numbers sixteen
through nineteen. They read as follows:

 16. Soard is, inter alia, (1) soliciting clients based on her prior experience
working on CCSI's and Citibank's behalf and (2) is targeting (or taking
advantage of) the confidential and specific policies, practices and procedures
which Soard learned solely because of her prior commitment and contrary to
her independent legal duties to keep such information confidential.


 17. Soard was admitted into Citibank's confidences with her pledge to
preserve them.


 18. Soard simply cannot honor her obligations under the Agreement, Texas
Disciplinary Rules of Professional Conduct, and Texas Rules of Evidence,
and, at the same time, defend the present case or prosecute the Defendant's
counterclaims against Citibank.


 19. Soard's representation of Defendant in the present case gives a strong and
irremediable appearance of impropriety.


 We read finding sixteen as a determination that the portion of Soard's private law
practice which focuses on debt relief and other remedial measures for debtors was undertaken
"solely" because of Soard's knowledge of Citibank's and/or CCSI's confidential or
proprietary information. But, as we have previously noted, Soard's resume, attached to
Citibank's disqualification motion, indicates extensive knowledge of debt collection
practices, and of both the Texas and federal fair debt collection practices acts. Citibank did
not specifically point out to the trial court, nor to us, what particularized knowledge or
information that was confidential or proprietary as to Citibank Soard was attempting to make
use of in the instant case. Again, the facts of this case are unlike those in Godbey or Meador
or any of the other reported cases in that the instant case does not involve 1) a client, or a
former client, or a former co-defendant consulted or assisted in prior litigation, or 2) a joint
defense agreement or joint defense enterprise, either personally signed by Soard in her
personal capacity as retained counsel for a co-defendant, or strongly implied from
consultation with other counsel representing a co-defendant for joint defense purposes in
some pending action. Findings seventeen through nineteen are also unsupported by the
evidence and are also based on the continued misplaced interpretation of the holdings in
Godbey and the other reported disqualification cases as noted previously. The trial court's
conclusions of law suffer from similar infirmity. Most of the conclusions of law rely heavily
on Godbey or attempt to neatly fit the instant facts to certain observations or holdings in
Godbey, but fail to provide the complete factual, legal, and procedural context present in
Godbey. Certain other "conclusions of law" are actually further factual findings not
supported by the record. (3)

 We conclude our analysis of the issue before us by reiterating a point that is uniformly
noted in most of the cases involving disqualification of trial counsel, that being the severity
of the remedy requested. On the record before us, all that has been factually established is
that Dalco's trial counsel, Kimberly Soard, possesses a generalized knowledge of consumer
protection/debt collection law sufficient to prosecute and defend a client alleged to have
failed to make payments on her credit card account. In our examination of the various
pleadings and other court papers filed by Soard, we find no probative evidence that anything
other than her basic educational and employment experiences, wholly separate from and
unrelated to any of the in camera material provided by Citibank, along with the possible
assistance of a number of legal treatises, practice guides, and form books, are the sources of
her defense of Dalco and of Dalco's claims against Citibank and Regent. See generally 27
Stephen Cochran, Texas Practice: Consumer Rights And Remedies (2002 & Supp.
2004); 28A Stephen G. Cochran, Texas Practice Series: Texas Consumer Law
Handbook (2005); 16 William V. Dorsaneo III Et Al., Texas Litigation Guide, chap.
242 (2005). See also, Bingham v. Collection Bureau, Inc., 505 F.Supp. 864 (D.N.D. 1981). 
 Because the trial court applied an improper standard of law to the motion to
disqualify, and found facts that were unsupported by probative evidence, its disqualification
of Kimberly Soard as Dalco's counsel was an abuse of discretion. Disqualification of counsel
renders remedy by appeal inadequate. See Skiles, 102 S.W.3d at 326. We conditionally
grant mandamus relief and will issue the writ only if the trial court does not vacate the order
of disqualification. 

 WRIT CONDITIONALLY GRANTED. 


 PER CURIAM


Submitted on December 1, 2005

Opinion Delivered March 2, 2006


Before McKeithen, C.J., Kreger and Horton, JJ.
1. Skiles was another somewhat unusual factual scenario involving the sharing of
confidential information between attorneys "made for the purpose of facilitating the
rendering of professional legal services, when such communications are made by the
client's lawyer to a lawyer representing another party in a pending action and concerning
a matter of common interest." Skiles, 102 S.W.3d at 326-27. Again, in the instant matter,
we have nothing even approaching such facts and circumstances. Thus, the holding in
Skiles is equally inapplicable to the instant case as is the holding in Godbey. 
2. These appear to be counterclaims against Citibank and a third-party action against
Regent & Associates rather than cross-claims. See Tex. R. Civ. P. 38, 97.
3. For example, "conclusion" ten makes the conclusory statement that Soard's
representation of Dalco is "substantially related" to Soard's "access" to Citibank's
confidential or proprietary information. Except for other such conclusory statements in
the various affidavits submitted by Citibank in support of its disqualification motion, the
record contains no probative evidence to support such a finding. "Conclusion" eleven
positively borders on the clairvoyant in finding Soard possessed a "mental blue print" of
Citibank's confidential or proprietary information which, "in all reasonable probability"
would be continually used against Citibank in the instant case. How the trial court
managed to divine this "mental blue print" is not apparent from the record we possess.